# TRAVERS *v.* THE UNITED STATES.

CRIMINAL LAW; CONFESSIONS; HOMICIDE; CHARACTER OF DE-
CEASED; MALICE; CHARGE OF COURT; MENTAL INCAPACITY.

1. Whether in a criminal case confessions when offered shall be per-
mitted to go to the jury at all, is a question very largely in the
discretion of the trial court, and its exercise thereof will not be
revised save for manifest error; following *Hardy* v. *United States,*
3 App. D. C. 35.

2. Where in a murder case according to the prisoner's testimony he
did not kill deceased, a woman, intentionally or under any appre-
hension that it was necessary to do so in order to save his own
life or prevent serious bodily injury, it is not error for the trial
court to exclude testimony to show the vicious and dangerous
character of deceased.

3. However sudden a killing may be, if the means used or the manner
of doing it or other external circumstances attending it, indicate
a sedate and deliberate mind and formed design to kill, it will
be upon express malice.

4. Where the charge of the court correctly defines the law of the case,
the refusal of a prayer for instruction is not error although it may
be technically correct and applicable.

5. Mental dullness, weakness or incapacity does not excuse a person
from the consequences of crime, unless it is shown that at the
time of the commission of the act he was so mentally impaired
-as not to be able to distinguish between right and wrong.

No. 463. Submitted May 20, 1895. Decided June 3, 1895.

HEARING on an appeal by a defendant indicted and con-
victed of murder. *Judgment affirmed.*

The COURT in its opinion stated the case as follows:

The appellant, James L. Travers, has been convicted of
the murder of one Lena Gross, in the District of Columbia,
on November 19, 1894, and has been sentenced to death.

Independent of the confessions of the prisoner, there was
testimony showing that he and Lena Gross had lived together
as man and wife; that she had been seen walking with him

on the Brightwood road between seven and eight o'clock on the morning of November 19th ; that groans were heard in the woods, and Travers was seen coming therefrom afterwards ; that he had made threats against the life of the woman. The dead body of the woman was found in the woods on the same day, concealed by leaves and branches of trees. Her throat had been cut, " the gash extending from a point under one ear to a point under the other ear and backward to the spinal column."

Travers, when arrested, said that he had left deceased asleep at Bronson's house at six o'clock in the morning and had not seen her afterwards. The surgeon who examined the body of deceased testified to a severe bruise or contusion upon the left side of her head, extending to the left eye and that the cut in the throat seemed to have been made by a single blow of a sharp instrument.

Travers made a confession of guilt to the officers at the station-house during the evening and night, and in order to test its truth he went voluntarily with them to the scene of the killing at night. He told them where to stop the wagon near the woods, and led them to the place where the body had been found, and where a blood stain was found on the ground. He conducted them to a manure heap where they uncovered the hat of deceased, which he had concealed therein. He also pointed to the dense brush where he said he had thrown the razor, but it was not found.

The prisoner made several statements concerning the homicide before the visit to the scene, and while there. After returning to the station-house he made a full confession, which was written down, and signed by him. After hearing testimony as to the manner in which the confession was made and to the accuracy with which it had been recorded, it was permitted to be read in evidence. Omitting formal caption and conclusion it reads as follows :

" I left my house about half past two o'clock in the morning on Monday, November 19th, 1894, to go to work

at Mr. Robinson's, on Brightwood avenue. Between seven and eight o'clock the same morning Lena Gross came down to Mr. Robinson's place after me. I was sitting down on the bars when she arrived. The first words she uttered were, 'Where is my money?' I replied, 'I have not the money with me.' She replied, 'Ain't you got it with you— I want to go to town?' She further remarked, 'Come, hurry up and give it to me; I want to go and buy a skirt and make it today, so I can go to service.' I then walked away towards Robinson's house and she followed me. I told her she had better let me buy it for her. She again replied, she wanted to get it and make it up today, so that she could go into service tomorrow. She added, 'You do nothing but tell me lies and give money to other women.' I said, 'Lena, you can't say that; you know I give you three to four dollars every Saturday night—all I make.' All this took place while we were going along towards Mr. Robinson's stables.

" (I have been living with her as my wife since the 12th of December last, 1893, but not married).

" I left the stable and went to the woods to 'do a job.' I left her sitting on a wheelbarrow in the stable yard. She came to me in the woods while I was there, in the act of buttoning up my clothes. I then went further into the woods and she followed me, asking for money. I went near to the place at which I afterwards killed her. She said I was the most 'honory son a bitch that ever lived.' I remarked, you called me that yesterday by the 'wine-house.' This conversation took place about five yards from the place where I killed her. She then took a razor from her stocking. I walked up to her, saying 'What are you trying to do? Are you trying to bluff me? You have already cut one man, but don't think you can cut me.' So saying, I tried to take the razor from her, and in so doing I shoved her down; while she was down I choked her. She got up and got a rock to throw at me. I then slapped her with my hand and walked away from her towards the

house.  She then went and sat down by the stumps where I afterwards killed her.  She called me back to kiss her. She put both of her arms around my neck, having the razor in her hand.  I took it from her and hit her with my fist. She fell right back, sprawling on the ground.  I thought I had killed her and went back to see, and found I had not ; having the razor in my hand, I bent down and cut her throat.  I then covered her over with dry brush and leaves and went away, believing she was dead.  I intended returning at night to bury her.  I took her hat and buried it in the manure heap to prevent detection.  I also threw the razor away into the woods, as it was bloody and the handle was broken off."

The coroner also testified that at the morgue, the day after the killing, he heard the prisoner's statement, in the course of which he said that the deceased lifted her skirt and took the razor from her stocking, and he said to her : "You cut another man," and then struck her and knocked her senseless, and did not like to see her suffer, and so he went back and pressed the razor into her throat.

On the trial the defendant offered himself as a witness, and his testimony is here given in full to show his version of the means used to elicit his confessions, and also the changes made in the story of the homicide :

James Travers, the defendant, was duly sworn and testified that he had been living with Lena Gross as husband and wife ; never had any trouble with her before ; never had threatened to do her any harm ; did not remember what he told Dr. Glazebrook ; did not remember saying anything to anyone at police headquarters about the killing. He further testified that while he was in the cell at the station house an officer came to the door and said to him (Travers), "What did you cut her insides with ?  What did you hit her with?"  Then this officer went away and another one came up and said, "We are dead on to you. You can't get out of it by saying you did not do it."  Then another police officer said, "I see the rope going around

your neck now ; " and the defendant further stated he was then very much excited and afraid, and after the officer had left him another officer came up and said, " You had better say you did it ; it will be ten times better for you," and he testified he then said he did it.    The officers then took him in a patrol wagon to Brightwood.    The wagon was full of officers and he was handcuffed to an officer.    When they returned to the station house it was then past two o'clock in the morning.    One of the officers said something about putting it up in the best advantage.    Two officers sat next to me and a man sat at a table writing and another man told him what to write.    I did not know what they said to me or what I was doing, I was so frightened and excited. The witness further testified he did not say, " I went away and came back and cut her throat."

The witness then testified that he was in the road near the fence when Lena Gross came up to him.    She asked him for some money, and he told her he did not have any. He said, I was walking towards the house and she, Lena, followed me.    Wanting to "do a job," I left her and went into the woods.    She then came into the woods where I was ; she then cursed me and I left her, going further into the woods, but towards the city, so as to get away from her ; she followed me and again asked me for money.    I told her I would get it for her later, but did not have it now.    She said, " You are trying to get away from me." I said, " No ; you know why I came up here."    She then pulled up her dress and took a razor from her stocking. I then said, " What are you trying to do ; you have already cut one man, but don't cut me."    I then tried to take the razor from her, and in so doing the handle was broken, but she held on to the razor.    I then left her and walked towards the stable.    I was very much afraid.    She got a rock and threw it at me.    She then went and sat down under a tree and said, " Come here, come here, come here, I say."    But I would not go back, and she said, " Come here, come here, come back and kiss me."    I was afraid of

her, but thinking she wanted me to make up I went back to her.  She was sitting on the stump and I knelt down next to her.  She put her arms around my neck and said, " Kiss me."  I then noticed she had the razor in her hand and was about to cut me.  I grabbed at it and she grabbed my mustache in her teeth, and we struggled for the razor. I was so excited I did not know just what had happened. I was afraid she would cut me and I wanted to get her teeth out of my mustache and stop her from cutting me, and also to take the razor away.  We struggled—my hands were hold of hers and hers hold of mine, razor in her hand—and the first thing I knew she fell back and her throat was cut; I don't know how, but during the struggle. I was then so scared I did not know what to do.  I threw a lot of leaves over her.  During the struggle we were both on the ground, she sitting on the stump and I on my knees, in front of her.  Defendant said he did not intend to cut Lena Gross or to harm or kill her, and did not know she was cut till she fell back, bleeding.

*Mr. Alphonso Hart* and *Mr. Alexander Wolf* for the appellant:

1. The court erred in permitting the confessions of the defendant to be given in evidence.  They were obtained from him by reason of hope held out to him and by threats made to him by persons in authority.  A confession is a person's admission or declaration of his agency or participation in a crime, and in order to be admissible in evidence must be free and voluntary ; that is, must not be extracted by any sort of threats or violence nor obtained by any direct or implied promises however slight, nor the exertion of any improper influence or coercion of any sort, because under such circumstances the party may have been influenced to say what is not true.  *Barnes* v. *State*, 36 Texas, 356 ; *Com.* v. *Curtis*, 97 Mass. 578 ; *People* v. *Johnson*, 41 Cal. 452 ; *Com.* v. *Nott*, 135 Mass. 269 ; *People* v. *Ward*, 15

Wendell, 231 ; *People* v. *Soto,* 49 Cal. 67 ; *Reg.* v. *Fennell,* 7 Q. B. D. 147 ; *Reg.* v. *Mansfield,* 14 Cox C. C. 639 ; *State* v. *Dildy,* 72 N. Car. 325 ; *Newman* v. *State,* 49 Ala. 9. It might be contended on the part of the Government that the confession of the appellant in regard to the finding of the hat was a sufficient circumstance to admit the confession in evidence, but at most, the facts only of the confession of the prisoner where the hat was, and the finding of it, could be given to the jury, but in no case could admissions of guilt accompanying the confession of the fact be given in evidence. *Murphy* v. *State,* 63 Ala. 1 ; *Kennan,* v. *State,* 11 Texas App. 356 ; *Sampson* v. *Com.,* 84 Pa. 200 ; *States* v. *Garvey,* 28 La. Ann. 925 ; *Yates* v. *State,* 47 Ark. 172. And it must be further remembered that the contention on the part of the appellant is not that he did not kill Lena Gross, but that the cutting which resulted in her death was the result of his attempting to defend himself, and take from her the razor in her possession, and she was cut in the struggle.

2. The Government should have shown all the circumstances surrounding the confession so that it might appear beyond doubt, the manner and circumstances under which it was made. It is incumbent on the Government to show all the circumstances under which the confession was made, and if there is any question as to the voluntariness of the confession, to show that the confession was voluntary, and if this is not shown, the confession should be excluded. *Thompson* v. *Com.,* 20 Gratt. 724 ; *Nicholson* v. *State,* 38 Md. 140.

The testimony in the case, as offered by the Government, while not showing all the circumstances under which the confessions were made, yet clearly shows that they were made under such circumstances as should have excluded them from the consideration of the jury. *Nolans* v. *The State,* 14 Texas App. 474.

There is a long line of cases which support the theory of the appellant, that confessions made in the manner as set

out in the first bill of exceptions are not admissible in evidence to show the guilt of the accused, and in no case should the court permit them to be given to the jury. *State* v. *Revells*, 44 Am. Rep. 436 ; *Commonwealth* v. *Knapp*, 9 Pick. 496 ; *Kelly* v. *State*, 72 Ala. 244 ; *Comm.* v. *Tuckerman*, 10 Gray (Mass.) 173. The written confession introduced in evidence was couched in such language that it showed on its face that it was not the language of the appellant. And the testimony shows that the confession was reduced to writing " word for word " as the appellant spoke it. And that the appellant is an ignorant man, being unable to read or write.

3. The court erred in not permitting testimony to be given in regard to the character of Lena Gross for viciousness. The testimony shows that the killing occurred during the struggle for the possession of the razor, and that Travers himself testified that he was afraid of Lena Gross, and that he was afraid she would kill him or inflict a dangerous wound on him ; and knowing she had cut one James Bryan, his fear and excitement was greatly intensified by that knowledge ; and in order to show to the jury her vicious character the court should have permitted evidence to be given as to her general reputation for viciousness. *Good* v. *The State*, 1 (Lea) Tenn. 293 ; *Little* v. *The State*, 6 (Bax.) Tenn. 493 ; *Heard* v. *People*, 25 Mich. 406 ; *Potter* v. *State*, 85 Tenn. 88.

4. It is not necessary, in determining the question of self-defence, that there should have been actual danger to justify the homicide, providing the accused had reasonable ground for believing that the deceased designed to kill him or to inflict on him great bodily harm and there was imminent danger of carrying such design into immediate execution. *Heard* v. *People*, 25 Mich. 406; *Brown* v. *Comm.* 86 Va. 466; *State* v. *Jones*, 29 S. C. 201 ; *Vollner* v. *State*, 24 Neb. 838 ; *State* v. *Kesling*, 74 Iowa, 528.

*Mr. Arthur A. Birney*, United States Attorney for the District of Columbia, and *Mr. Tracy L. Jeffords*, Assistant Attorney, for the United States.

Mr. Justice Shepard delivered the opinion of the Court:

1. The first assignment of error is on the exception taken to the admission of the defendant's confessions, on the ground that the same were procured through hopes held out to him and threats made against him by the officers who held him in custody. Defendant's statement of the means used to induce him to confess is given in his testimony set out above.

On behalf of the Government, the testimony of the officers as to the first confession was that no inducement had been held out to the prisoner, no promises given or threats made. Officer Brennerman said to the prisoner, " Why did you kill that woman ? Why don't you make a clean breast of it ?" He further said he was satisfied of the prisoner's guilt, and would like him to tell all the circumstances ; "no necessity to keep anything back." As regards the written confession made and signed after the return from the scene of the homicide and on the same night, the Government offered evidence that it was taken down as the witness gave it, that he understood it, and that he made it and subscribed it without threats, promises or inducement of any kind. Satisfied that this evidence warranted him in letting the confessions go to the jury, the learned trial justice admitted them, but left the question of their consideration finally to the jury in a charge very fair to the prisoner. We find no error in this action. The confessions of a prisoner are sometimes most satisfactory evidence ; though, for well established reasons, they should be carefully scrutinized as to the means by which they may have been obtained, and should not be admitted, to the prejudice of the prisoner, when there is reason to believe that they have been procured by means of fears produced or favors promised for the purpose. That they have been made by one in con-

finement or to the officer holding him in custody, does not affect their competency. Whether confessions, when offered, shall be permitted to go to the jury at all, is a question very largely in the discretion of the trial court, and his exercise thereof will not be revised save for manifest error. *Hopt* v. *Utah*, 110 U. S. 574; *Hardy* v. *United States*, 3 App. D. C. 35.

In Hardy's case, we had occasion to examine and consider the questions relating to the admissibility of confessions with great care, for it too was a case in which the appellant was under sentence of death. As this case is ruled by that, we need do no more than refer to the opinion therein for the reasons that control our judgment. See also, *Sparf* v. *United States*, 156 U. S. 51, 54.

In this case, moreover, it appears that the confession was verified in part by discoveries of certain physical facts through its means, and as to such parts was admissible without regard to other considerations. Wharton's Cr. Ev., sec 678; 3 Russell on Crimes, 419. Again, the defendant's own evidence as a witness for himself followed the confession closely save in one point only, and in that its truth was far better supported by the physical facts than was his conflicting statement.

2. The next assignment of error is on the refusal of the court to permit defendant to prove that deceased was a vicious and dangerous woman. Very often, in cases where there is evidence tending to make a case of killing in self-defence, the motive of the defendant being the issue of first importance, evidence of the dangerous character of the deceased has been admitted. Whenever the facts are such that the known reputation of deceased for violence may tend to explain or account for the conduct of his slayer, or the reasonableness of his apprehension of danger at the time of the fatal encounter, evidence thereof may not only be pertinent, but also, sometimes, entitled to great weight. Some such reasonable foundation, however, is a necessary prerequisite. Wharton Cr. Ev. sec. 69 *et seq.*; *Horbach* v.

*State,* 43 Tex. 242. The leading case of *Hurd* v. *People,* 25 Mich. 405, relied on by appellant, recognizes this reasonable limitation also.

There was no sufficient foundation for the admission of the evidence in this case. According to the defendant's statement, as a witness on his own behalf, he did not kill the deceased intentionally, or under any apprehension that it was necessary to kill her in order to save his own life or prevent serious bodily injury. There was no other testimony on which it could rest.

3. The next assignment of error is on the refusal to give the jury the following prayer asked by defendant :

" Murder is the unlawful killing by a person of sound mind and discretion of any reasonable creature with malice aforethought. To constitute the crime there must be a malicious, deliberate and premeditated purpose to kill. The accused must have deliberately formed in his mind the intention to take life and to have carried out that intention."

In the general charge the court informed the jury that the defendant might be found guilty of murder or manslaughter, or acquitted altogether if he killed deceased in the reasonable apprehension of danger to his own life, and proceeded as follows :

" If the killing is malicious—that is, if it is done with malice—it is murder ; if it is done without malice and is not excusable, then it is unlawful and is manslaughter. The word ' malice ' as used in this indictment is not confined in its meaning to hatred or ill-will, but it includes any deliberate, unlawful, cruel act done by one person towards another. It is not necessary in order to make malice that the defendant should have planned beforehand the killing of deceased. If he conceived the purpose of killing her a moment before he struck the blow, or the very second that he struck the blow, if it was done with a purpose to kill and was not justifiable, then it is murder. If, therefore, you should find from the evidence beyond a reasonable

doubt that the defendant cut the throat of the deceased intentionally and not by accident or in self-defence, with a razor or any other like sharp instrument, he should be found guilty as indicted, whether you believe he had any hatred toward her or not, or even if you should believe that he had a great affection for her and killed her because of jealousy."

In addition to this, we may add, also, that the jury were charged to acquit the defendant if they should find that he and deceased were engaged in a contest, and that she was cut without intent on the part of defendant to inflict the wound. With respect to manslaughter, the jury were thus charged in the same connection:

" If you shall find from the evidence that the defendant and deceased were engaged in a sudden quarrel and squabble, instigated by the deceased making an assault upon the defendant with the razor, and that such assault by the deceased and her conduct during the quarrel were such as reasonably to incite the passions of the defendant, and that they were so incited, and that as a result of that passion and during the squabble he inflicted the mortal wound without any malice or intention of killing her, then he should be convicted of manslaughter. That involves the principle of killing in hot blood engendered by a sudden quarrel. If you believe from the evidence that they got into a sudden quarrel, and that her conduct towards him was such as reasonably to incite a man's passion and make him lose control of himself, and that in that condition and while the squabble was going on and while they were enraged he cut her throat in the heat of passion and without any malice, it was manslaughter because of the absence of malice."

At the request of the defendant the court also charged the jury very fully on the law of self-defence, in a manner quite favorable to the defendant.

No reasonable objection can be urged to the charge of the court. In some respects it was even more favorable to the defendant than he had any right to expect. The defi-

nition of malice and the distinction between homicide committed therewith, and upon sudden and uncontrollable passion, are plainly and correctly drawn. A charge should always be drawn with reference to the particular facts of the case on trial. The objection to the defendant's prayer is that it did not conform to this requirement. Considering the nature of the evidence to which it was asked to be applied, it laid too much stress upon the necessity of premeditation, of previously formed design, and was calculated to create the impression upon the jury that there could be no such thing as express malice, or a killing with a sedate and deliberate mind, where the intention to kill had been suddenly formed during the encounter, or at and about the time of the fatal blow. "Malice aforethought," as was correctly said in the charge, does not require that the killing should have been planned beforehand. It does not necessarily imply previous grudges, or ill-will, and is not alone shown by lying in wait to kill, or by deliberate plans and preparations to take life. However sudden the killing may be, if the means used, or the manner of doing it, or other external circumstances attending it, indicate a sedate and deliberate mind and formed design to kill, it will be upon express malice. 1 Russell on Cr. 667; *McCoy* v. *State*, 25 Tex. 33.

There must indeed be prior intention to kill, as contradistinguished from an act done under the influence of a sudden paroxysm of rage aroused by some adequate cause, but it is not necessary that it should have existed for any particular period of time. 1 Wharton Cr. Law, sec. 380; Id. sec. 315; Id. sec. 116.

The charge of the court having correctly defined the law of the case, the refusal of defendant's prayer would not have been error even had it been technically correct and applicable.

4. The last error to be considered arises on an exception taken to the denial of the following special prayer of the defendant:

" If the jury find that the defendant cut the throat of Lena Gross, and if they further find that at the time he committed the act he was laboring under such defect of reason as not to know the nature of the act, or if he *did* know its nature he did *not* know that he was doing wrong, or if he knew it was wrong that he did not have the mental power to refrain from doing it, they should find him not guilty."

The whole of the evidence concerning the defendant's mental condition is found in the following extract from the bill of exceptions :

" The defendant offered evidence tending to prove the good character of the defendant for peace and good order, and they also testified that at times he acted peculiar and strange ; that his eyes would roll and look ghastly, and that he was a man easily led and of an excitable nature, very dull of comprehension, and it was necessary to speak to him several times before he would understand, and he seemed to always have something on his mind. The defendant then produced as a witness John Travers, the father of the defendant, who testified as follows : That the defendant was his son, and that he acted different from other children and was peculiar in his manner and acted as if he were crazy ; that his mother, wife of witness, had been weak minded and at times crazy and subject to fits ; that the defendant was thrown from a mule when he was twelve years old and fell on his head and was dragged a long distance, and was confined to his bed for a long time, and when he came out he was worse than before, and that in the neighborhood where he lived defendant was known as " Crazy Jim ; " that he used to mutter and talk to himself and was subject to fits, and that the defendant's sister is also peculiar and talks to herself. He would roll his eyes, and he, witness, cautioned people to watch out for him when he rolled his eyes, as he was afraid he would do some harm or have some harm done him. And said defendant called witnesses as other persons, some of whom had employed the defend-

-ant at different times during the past five years, and others of whom had worked with said defendant during such period or otherwise had opportunity to know his reputation and character; and said persons gave evidence tending to prove that the reputation of the defendant for peace and good order had been always good; but said persons on cross-examination gave evidence tending to prove that the defendant had not at any time during their acquaintance with him acted in any way to indicate that he was insane or of unsound mind."

There was no error in refusing the prayer as requested, and we are not prepared to say that it would have been error not to have submitted the issue to the jury at all. The court, however, did give the jury the following instruction:

" Some evidence has been given in relation to the mental condition of the defendant. Mental dullness, weakness, or incapacity does not excuse from the consequences of crime, unless the evidence proves that the defendant was at the time of the commission of the act so mentally impaired that he could not distinguish between right and wrong. It is immaterial how ignorant or mentally weak, if at all, the defendant may be; if he knew what he was doing and that it was wrong, he is responsible. The law presumes sanity and responsibility for crime until the contrary is shown. Does the evidence prove or does it leave your minds in reasonable doubt upon the question whether the defendant knew or responsibly appreciated that it was wrong to kill a human being? Unless it does you should not acquit upon the ground of mental incapacity."

Giving the defendant the benefit of every possible doubt that could arise, the foregoing charge was ample, and there is nothing in it of which he can justly complain.

Finding no error in the judgment, *it must be in all things affirmed. It is so ordered.*