## COLLAZO v. UNITED STATES.

### No. 11022.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 19, 1951.
Decided Feb. 28, 1952.

Writ of Certiorari Denied June 2, 1952.

See 72 S.Ct. 1065.

7. See footnote 1, supra.

Leo A. Rover, Washington, D. C., with whom Sidney S. Sachs and Kenneth D. Wood, Washington, D. C., were on the brief, for appellant. (Counsel for appellant were appointed by the District Court.)

John D. Lane, Asst. U. S. Atty., Washington, D. C., with whom George Morris Fay, U. S. Atty. at the time the brief was filed, and John W. Fihelly and Joseph M. Howard, Asst. U. S. Attys., all of Washington, D. C., were on the brief, for appellee. Charles M. Irelán, U. S. Atty. at the time of argument, Washington, D. C.,

also entered an appearance on behalf of appellee.

Before STONE, Circuit Judge (Retired), and PRETTYMAN and FAHY, Circuit Judges.

PRETTYMAN, Circuit Judge.

This is an appeal from a judgment of conviction on all counts of an indictment which contained two counts of first degree murder and two counts of assault with intent to kill. The nature of the case itself and of appellant's contentions require that the statement of our considerations be at some length.

We first consider the first count under the first degree murder charge. This count is a charge in the language of the statute. The count reads: "On or about November 1, 1950, and at and within the District of Columbia, Oscar Collazo and Griselio Torresola (since deceased), unlawfully, feloniously, willfully, purposely and with deliberate and premeditated malice, shot and murdered Leslie Coffelt. (Violation Title 22, Section 2401, D.C.Code, 1940 Edition.)"

The local statute on first degree murder reads: "Whoever, being of sound memory and discretion, kills another purposely, either of deliberate and premeditated malice or by means of poison, or in perpetrating or attempting to perpetrate any offense punishable by imprisonment in the penitentiary, or without purpose so to do kills another in perpetrating or in attempting to perpetrate any arson, as defined in section 22–401 or 22–402 of this Code, rape, mayhem, robbery, or kidnapping, or in perpetrating or in attempting to perpetrate any housebreaking while armed with or using a dangerous weapon, is guilty of murder in the first degree."[1]

A premise in the consideration of this matter is Section 105, of Title 22, of the District of Columbia Code (1940), which reads as follows: "In prosecutions for any criminal offense all persons advising, inciting, or conniving at the offense, or aiding or abetting the principal offender, shall be charged as principals and not as accessories, the intent of this section being that as to all accessories before the fact the law heretofore applicable in cases of misdemeanor only shall apply to all crimes, whatever the punishment may be."

Torresola actually shot and killed Coffelt. The present appellant, Collazo, was indicted and convicted under the foregoing first count upon the theory that he advised, incited, or connived at the offense, or aided or abetted the principal offender, and thus was himself a principal.

The following facts are established either by the testimony of the appellant himself or by so many disinterested eye witnesses as to be beyond dispute:

Appellant Collazo and the man named Torresola were Puerto Ricans. As boys they lived in the same town. In 1950 they were both in New York City and had seen each other a few times at public meetings of the Nationalist Party of Puerto Rico. On October 29, 1950, Torresola went to Collazo's house with a copy of a Spanish newspaper. They left the house and talked for about two hours about things that were taking place in Puerto Rico. Torresola proposed that they go to Puerto Rico with the intention of giving any help they could.

Puerto Rican matters which they discussed included the so-called Ponce Massacre in 1937; a letter written by an American doctor in 1933; the loss by Puerto Ricans of the control of their port facilities; the loss of their farms by the Puerto Ricans; the killing of Puerto Rican University students in 1934; the organization of the Nationalist Party in Puerto Rico; and the condition of school children in Puerto Rico. "We discussed everything * * *." According to the newspapers in October, 1950, Nationalist Party leaders returning from a public meeting in Fajardo were intercepted by police who tried to assassinate them, fighting broke out in different cities in Puerto Rico, and some thirty people were killed and fifty-one wounded.

The night of October 29th Torresola told Collazo that he had a gun and would

1. 31 Stat. 1321 (1901), 54 Stat. 347 (1940), D.C.Code § 22–2401 (1940).

get Collazo one. Collazo gave him fifty dollars with which to buy the gun.

The two men met again in New York City the night of October 30th. Collazo told Torresola that instead of going to Puerto Rico a better idea would be to go to Washington and by making some kind of demonstration there bring the situation in Puerto Rico to the attention of the American people. He pointed out that the American people know practically nothing about Puerto Rico or the situation there. They decided upon that plan. Torresola gave Collazo the pistol he had bought for him.

The next day, October 31st, Collazo withdrew a hundred dollars from the bank, did some shopping, buying a suit of clothes, a shirt, underclothing, and a small valise, and bought railroad tickets from New York to Washington.

The two men met at the Pennsylvania Station in New York and took the three-thirty train to Washington. Collazo testified: "In the first place we figured out that a demonstration would never be serious enough * * * to attract the attention of the American people if we were not hurt or wounded or killed in some way."

Upon arriving in Washington the men separated and separately registered at the Harris Hotel under assumed names. The next morning, which was November 1st, they took a taxi and were driven around the city. The taxi driver pointed out Blair House to them and told them that, the White House being under repair, the President of the United States lived in Blair House temporarily. After that they took a walk of a mile or so and then went to lunch. They returned to the hotel and cleaned and oiled their guns. Torresola showed Collazo how to handle the gun, how to fire it, how to insert and remove the clip, and how to insert the bullets in the clip. They took a taxi to the corner of Pennsylvania Avenue and Fifteenth Street. They walked from there to Blair House and returned to the same corner. They decided the best way would be for Collazo to walk west toward Blair House on that (the north) side of the street and that Torresola would cross Pennsylvania Avenue, walk

down the street, and recross to Blair House. They planned to meet on the steps of Blair House.

Blair House is really two houses, on the north side of Pennsylvania Avenue. At the east end of these houses, on the sidewalk, is a small wooden guard box with a door opening toward Blair House. At the west end of the houses, on the sidewalk, is an exactly similar guard box with a door opening toward Blair House. Each of the houses has a front entrance, which is a half floor above the sidewalk and is reached by a flight of steps up from the sidewalk. The main entrance is in Blair House itself, which is the easterly of the two houses. As Collazo and Torresola approached, the locations of the officers on guard were: White House Officer Davidson and Secret Service Agent Boring were in the east guard box. White House Officer Birdzell was on the sidewalk immediately in front of the main entrance to Blair House, at the foot of the steps. Officer Coffelt was in the west guard box. Officer Downs was on his way from the west guard box toward the alleyway alongside the west end of Blair House, in which was an entrance to the basement of the house.

Collazo approached from the east, passed the east guard box, and walked up to within from three to eight feet of Birdzell. Birdzell's back was toward him. Torresola, having recrossed Pennsylvania Avenue, approached from the west and stopped at the west guard box. Collazo watched Torresola. Collazo took his gun out, pointed it at Birdzell's back, and pulled the trigger. He had forgotten to release the safety catch. He then released the catch and fired, hitting Birdzell in the upper part of his leg. Simultaneously Torresola fired three shots at Coffelt, who was inside the guard box, and, turning, fired at Birdzell and then at Downs. Coffelt slumped to the floor, pulled his gun, and began firing, killing Torresola. In the meantime, when Birdzell heard the click of Collazo's gun, he whirled, drew his own gun, and moved toward the center of Pennsylvania Avenue, firing at Collazo as he went. Birdzell was hit by Collazo's first shot and again by a shot from Torresola's gun. Instantaneously with Collazo's

shot Agent Boring and Officer Davidson drew their guns and began firing from the east guard box. Collazo turned and began firing at them. He fired his entire clip, then sat down on the steps, removed the old clip, inserted a new one, and continued firing. Officer Davidson shot Collazo in the chest, and Collazo slumped to the sidewalk.

## I

In the course of its instructions to the jury the court said, among many other things:

"The elements of the offense as charged in the first count outlined in the statute are four. The first is the act, purposely done. The second element is malice. The third element is premeditation. The fourth element is deliberation. Each and all of these elements, as alleged in the indictment, must be established beyond a reasonable doubt before you may find the defendant guilty of murder in the first degree on this count.

"As to the first count malice is an essential element of murder in the first degree and of murder in the second degree. The term malice in this connection does not necessarily involve hatred or personal ill will or revenge, which is the meaning given to the term in other uses, although its meaning in the law includes such meaning. The term 'malice' is much broader in its legal definition. The legal definition of 'malice' is the intentional doing, not the accidental doing, of any wrongful act to the injury of another without legal justification or excuse, and unattended by circumstances which reduce the act to manslaughter. The legal definition comprehends a heart regardless of social duty, a mind bent on mischief, a generally depraved, wicked and malicious spirit.

"The act must be purposely done. In other words, it must be done intentionally.

"Premeditation is the formation of the intention or plan to kill, the formation of a positive design to kill. To premeditate is to think of the act before doing it.

"Deliberation is an essential element of murder in the first degree. That the defendant acted with deliberation means that he acted with considered thought upon a design to kill. There must have been re-flection by him on this design. The jury is required to determine from the facts and circumstances surrounding the killing whether the defendant acted with reflection and consideration amounting to deliberation.

\*   \*   \*   \*   \*   \*

"If a man uses an instrument upon another of such a nature and in such a way, and under such circumstances that such use would naturally and probably result in death, then you may infer that he intended to kill. The jury is not compelled to presume that the defendant intended to kill from such facts, but may consider such facts in considering whether there was a purpose to kill.

\*   \*   \*   \*   \*   \*

"As to the first count it is not necessary that the jury find that the defendant inflicted the fatal wounds.

"If you believe, from the evidence in this case, beyond a reasonable doubt, that the defendant Oscar Collazo had entered into an agreement with Griselio Torresola, since deceased, to kill, if necessary, any one of the persons guarding the President, and they agreed together with each other in so doing, and had previously formed and deliberated upon a design in which the minds of the two united and concurred in the common intent to take the life of any of the persons guarding the President, if necessary, and in pursuance of a previously formed design and in pursuance of said common intent of both, the said Griselio Torresola took the life of Leslie Coffelt, then you will find the defendant guilty of first degree murder.

\*   \*   \*   \*   \*   \*

"The Court should also tell you that the defendant's views about the situation in Puerto Rico have absolutely nothing to do with this case, and when I say absolutely nothing, I mean exactly what I say. There are many who think that under American control Puerto Rico is infinitely better off than it was under Spanish control, and since 1948 Puerto Ricans elect their own legislature and their own government. The President of the United States appoints the judges of the Supreme Court and has the

veto power, so far as American control is concerned, whatever may be the facts in Puerto Rico, they have nothing to do with this case and you should not and you must not consider them in connection with your deliberations. The Court is making no suggestion at all as to what your conclusion should be, but the Court does say to you most emphatically and absolutely that the Puerto Rican situation is not involved in any sense or to any extent in the trial of this case."

■ Appellant says that the last-quoted instruction of the court relating to his (appellant's) views about the situation in Puerto Rico was reversible error. We think it was not.

■ A charge to a jury should be drawn with reference to the particular facts of the case on trial. In the case at bar the court, as we have seen, instructed the jury that malice is an essential element of murder in the first degree; that the act must be done purposely, i. e., intentionally; that premeditation and deliberation are essential elements of first degree murder, and the court defined those terms. Then the court instructed that, if a man uses upon another an instrument of such a nature and in such a way as to result naturally and probably in death, the jury might infer—but "is not compelled to presume"—that he intended to kill. No error is alleged with respect to these portions of the charge, and none could be shown. It is, in outline and substance, the charge from this jurisdiction approved by the Supreme Court in Fisher v. United States.[2]

Then the court felt that it was advisable to comment upon the evidence which had been presented, in the absence of objection from the prosecuting attorney, with reference to conditions in Puerto Rico. The court correctly, we think, said that that evidence had "nothing to do with this case".

Briefly, appellant's contention is that the hours of testimony given by Collazo concerning his version of a long span of Puerto Rican history, culminating in the oppression of the Puerto Rican people by the Government of the United States, buttressed the defense that Collazo's intent in proceeding with Torresola to Blair House on November 1st was merely to stage a demonstration, albeit one in which they might be killed, which would attract popular attention to conditions in Puerto Rico. Appellant does not contend that his views as to Puerto Rico in and of themselves constituted a defense to the charge of murder. He contends that those views were (1) relevant and material to the issue of his purpose (intent) and (2) materially responsive to the prosecutor's claim of motive, i. e., a reason, for what was done.

■ For clarity in the discussion we describe the meanings in which three words are used. The word used in the statute, supra, defining first degree murder is "purposely". In this jurisdiction "intentionally" is synonymous with "purposely" in this connection.[3] The purpose (intent) which is thus a requisite element in the offense is a purpose (intent) to kill. The term does not refer to the purpose of, or the intention in, the killing. The word "motive", on the other hand, means the reason for the killing. The law sharply limits the relevancy and materiality of motive in murder cases. If the fact of killing by an accused is in issue, i. e., if the accused denies that he committed the act, the prosecutor is permitted, as part of his effort to prove that the particular accused did commit the act, to prove that the accused had a motive for killing the deceased. Likewise, in such a case, the accused, as part of his effort to prove that he did not commit the act, is permitted to prove that he had no motive, no reason, for killing the deceased. Furthermore, the law permits purposeful killing for certain carefully limited reasons, or motives, principal among them being self-defense.[4] But, if a killing is purposed (intended) and none of the established legal

2. 1946, 328 U.S. 463, 66 S.Ct. 1318, 90 L. Ed. 1382.

3. Jordon v. United States, 1936, 66 App. D.C. 309, 311, 87 F.2d 64, 66, certiorari denied, 1938, 303 U.S. 654, 58 S.Ct. 762, 82 L.Ed. 1114.

4. Travers v. United States, 1895, 6 App.D. C. 450, 459.

excuses for purposed killing is pleaded, the motive of the killer is wholly immaterial.[5] The courts frequently point out that not even the highest motive, outside the well-recognized legal justifications, is a defense to purposed killing. Purpose (intent) to kill must always be proved in order to convict for murder under the first clause of the above-quoted statute, but the instances in which motive for the killing is a material element in defense are limited.

With these elementary guides in mind, we come to the case at bar. Eminent and able counsel for appellant state their contention clearly and accurately. They deny that their client purposed to kill and thus put in issue his purpose (intent) to kill. They assert that his views concerning Puerto Rico were relevant and material evidence upon that issue, i. e., that that evidence bore, materially, upon the question whether their client, in doing what he did, purposed (intended) to kill anybody.

Consideration of the question falls into two parts: first, whether the evidence was relevant and material to the issue of intent on the part of Torresola, who actually fired the fatal shots; and, second, whether it was relevant and material to the scope of the intended joint venture of Torresola and Collazo.

The evidence is undisputed that Torresola used a loaded pistol of heavy caliber upon Officer Coffelt in such a way as to result naturally and probably in the officer's death. He pointed the pistol at the officer, confined inside the small guard box, and pulled the trigger three times, firing three shots. The jury, as the trial judge told them, had to decide whether the killer purposed (intended) to kill the officer in using the weapon in that way. When he pointed the gun and pulled the trigger did he purpose to kill? We agree with the trial judge that the views of the killer concerning Puerto Rico had nothing to do with that question.

The second part of the consideration relates to Collazo's participation. Under the first count and the charge of the court thereon, Collazo could not have been convicted of murder in the first degree without a determination by the jury that he and Torresola had entered into an agreement which encompassed a purpose (intent) to kill. Collazo does not now complain that there was insufficient evidence to support such a finding. His contention is that his views concerning Puerto Rico were relevant and material to that question.

The scope and content of a confederated plan is to be drawn from the facts.[6] Torresola procured two pistols, instructed Collazo in their use, and the two men cleaned, oiled and loaded their weapons. They then proceeded to Fifteenth Street and Pennsylvania Avenue and put into execution the plan which they had conceived. They started walking west from Fifteenth Street on the north side of Pennsylvania Avenue. Torresola crossed the street, and the two proceeded west, one on the north side and the other on the south side. Having reached Seventeenth Street, Torresola recrossed the Avenue and approached Blair House from the west. Collazo approached it from the east. Collazo watched Torresola's movements and keyed his own to them. Torresola walked to the west guard box and shot three times at Officer Coffelt. At precisely the same time, Collazo aimed his pistol at the back of Officer Birdzell and pulled the trigger. Collazo described his own action thus: "I stepped forward, I took my gun out and I pointed it at him and I tried to fire the first time, but it didn't go off * * *." On cross examination Collazo testified concerning his firing at Officer Birdzell:

"Q You aimed it at Officer Birdzell who was standing in the center stairway of the Blair House? A Yes, sir, I did.

"Q You meant to hit him? A I meant to hit him." [7]

---

5. 1 Burdick, Law of Crime § 130 et seq. (1946); 2 id. § 447.

6. For a discussion of the evidentiary facts which are admissible to show a plan or design, see 1 Greenleaf, Evidence § 14m (16th ed. 1899); 2 Wigmore, Evidence §§ 237, 238 (3d ed. 1940).

7. We have added to this opinion as an Appendix excerpts from Collazo's testimony before the jury at the trial.

Thus the two men had carefully planned the venture. They were at the same spot by agreement. They both had loaded guns by mutual action. They carefully coordinated their movements. They aimed their guns simultaneously at two different officers. They simultaneously pulled the triggers. One gun fired and the other accidentally did not.

The decisions and opinions in Marcus v. United States[8] and in Patten v. United States[9] are pertinent as depicting the scope of the responsibilities assumed by participants in enterprises such as this. Both dealt with cases in which the appellants were not the actual doers of the fatal acts. In the first-named case Marcus and one Cummings agreed to rob a meat truck. Marcus knew that Cummings had a loaded pistol. Cummings shot and killed the truckman. A conviction of Marcus for first degree murder was affirmed, this court observing that "Marcus knew that Cummings was to use a pistol if necessary in accomplishing his unlawful actions."[10] In the Patten case several men, including Patten, beat another with heavy staves. One Dougherty then stabbed the victim to death with a knife. Patten was tried separately and convicted of manslaughter, but this court observed that he was guilty of murder. The court said, among other things:

"A man is presumed to have intended the natural or probable consequences of his acts, so if he sets in motion the physical power of another, contemplating the result, he is answerable therefor, though it be produced in a manner not contemplated. 'If he did not intend it in kind, yet if it was the ordinary effect of the cause, he is responsible.' Bishop, Crim.Law, sec. 641. And when two or more persons combine or conspire to commit a criminal offense, each is responsible for the acts of the others in furtherance of the common purpose, if the act done either is within the scope of that purpose, or is the natural or probable consequence of the act intended. * * *

"* * * The purpose and intent of the conspirators was either to kill Spencer or to do him great bodily harm and, under such circumstances, where death ensues, all are guilty not of manslaughter, but of murder, either in the first or second degree, according as premeditation has or has not been shown."[11]

■ The question for the jury on this phase of the present case was whether the purposed killing by Torresola was within the design or plan of the two men, and in determining that question they were entitled to consider whether it was a natural and probable result of the acts which Torresola and Collazo concerted to perform.[12] Collazo specifically stated, as shown above, that he intended to hit Birdzell when he

8. 1936, 66 App.D.C. 298, 86 F.2d 854.

9. 1914, 42 App.D.C. 239.

10. Supra, 66 App.D.C. at page 306, 86 F. 2d at page 862. Marcus was indicted, tried and convicted under the then first degree murder statute in this jurisdiction, 31 Stat. 1321, D.C.Code § 798 (1901), under which purpose, i. e., intent, was an essential element of murder in the attempt or perpetration of a felony. The statute has since been amended by the Act of June 12, 1940, 54 Stat. 347, so that intent is no longer an element of first degree murder where the killing is in the perpetration or attempt to perpetrate certain enumerated felonies.

11. Supra, 42 App.D.C. at page 247–249. See United States v. Boyd, C.C.W.D.Ark. 1890, 45 F. 851, reversed on other grounds, 1892, 142 U.S. 450, 12 S.Ct. 292, 35 L.Ed. 1077.

12. See Agnew v. United States, 1897, 165 U.S. 36, 17 S.Ct. 235, 41 L.Ed. 624; Wright v. United States, 8 Cir., 1949, 175 F.2d 384, certiorari denied, 1949, 338 U. S. 873, 70 S.Ct. 143, 94 L.Ed. 535; Shockley v. United States, 9 Cir., 1948, 166 F.2d 704, certiorari denied, 1948, 334 U.S. 850, 68 S.Ct. 1502, 92 L.Ed. 1773; Suhay v. United States, 10 Cir., 1938, 95 F.2d 890, certiorari denied, 1938, 304 U.S. 580, 58 S.Ct. 1060, 82 L.Ed. 1543; Laws v. United States, 10 Cir., 1933, 66 F.2d 870; Savitt v. United States, 3 Cir., 1932, 59 F.2d 541; Collins v. United States, 8 Cir., 1927, 20 F. 2d 574; People v. King, 1938, 30 Cal. App.2d 185, 200, 85 P.2d 928, 938; State v. Cushing, 1941, 61 Nev. 132, 148, 120 P. 2d 208, 216. And see also the 4th assignment of error considered in Allen v. United States, 1896, 164 U.S. 492, 17 S. Ct. 154, 41 L.Ed. 528.

fired his pistol, an act which was itself a crime.[13] The question before the judge as he instructed the jury was one of relevancy, *i. e.*: Did the testimony as to conditions in Puerto Rico afford any reasonable basis for an inference or presumption as to the material fact in issue,[14] whether a purpose (intent) to kill was within the scope of the joint plan? Trial judges frequently must tell a jury what evidence is or is not material to an issue given the jury to decide. This trial judge instructed the jury that they must decide the issue of purpose or intent, and he told them that conditions in Puerto Rico were not relevant or material to that issue as posed by the circumstances in this case.

To put the problem in language devoid of legalisms, let us put it thus: If the facts as to what these two men did were before us, *i. e.*, that they by agreement simultaneously fired point-blank at close range at two different officers, and if we were required to decide whether their agreement included the probability of killing someone, would information as to Collazo's views on Puerto Rico help us in any manner in answering that question? We are of clear opinion that it would not. Those views did not tend to throw any light on what the two men purposed to do when they did what they actually did. Had the judge left the jury uninstructed on the point, he would have left them to consider motive, a wholly immaterial consideration upon the issues presented in the case.

■ The jury were not instructed to disregard Collazo's statements on the stand as to the alleged limited purpose of the demonstration. He was properly allowed to testify as to his own intent.[15] What was excluded from the consideration of the jury was the prolonged collateral testimony concerning Puerto Rico.

It seems to us, as it did to the trial court, that the views of the two confederates concerning Puerto Rico were irrelevant or immaterial, or both, to the issue whether their contemplated demonstration did or did not include a purposed or intended killing. To have let the jury speculate, without instruction, on the applicability and effect of that evidence would have been an erroneous neglect by the judge of his duty to instruct upon such matters as matters of law.

In respect to appellant's contention that the evidence as to Puerto Rico was responsive to the prosecutor's claim of a motive shown by that same evidence, it is enough to say that the trial judge excluded that evidence entirely, for all purposes, those of the prosecutor as well as those of the defense. The prosecutor's view having been excluded, there was no need for a response.

## II

■ Appellant's second point is that the grand jury was illegally drawn. He says that the jury commissioners had not taken the oath prescribed by the statute, that they were not rotated in their appointments, and that no sufficient showing was made that Commissioner Saccardi was so ill at the time as to excuse him from participation in the drawing of the jury. The commissioners were duly appointed and did take the oath of office; they did not take it again upon their reappointment. But their original appointment was "until their successors are appointed and qualified".[16] Therefore they were validly acting as "holdovers" under their first appointment.[17] Furthermore, there was no specific statutory reference to an oath upon reappointment. Probably a better procedure would be to renew the oath upon each reappointment, but a failure to do so is not such an omission as would invalidate all subsequent acts of the commissioners.

13. 31 Stat. 1321 (1901), D.C.Code § 22–502 (1940).

14. See 1 Wharton, Criminal Evidence § 222 (11th ed. 1935); cases collected in 22 C.J.S., Criminal Law § 600.

15. See 2 Wigmore, Evidence § 581 (3d ed. 1940) and cases there collected; People

v. Levan, 1945, 295 N.Y. 26, 64 N.E.2d 341.

16. D.C.Code § 11–1401 (1940) (Supp. VII).

17. Badger v. United States, 1877, 93 U.S. 599, 23 L.Ed. 991.

The statute provides that if one commissioner is ill the other two may act.[18] When the motion to dismiss the indictment was made in the present case, the Government presented an affidavit of Commissioner Bliss, reciting that when this grand jury was drawn Commissioner Saccardi was ill. Defendant contested the sufficiency of the affidavit, and the trial judge gave both sides time within which to present oral testimony. Defendant offered none. As a matter of fact the court records, of which the judge was asked to take judicial notice, showed that Mr. Saccardi died in the next month.

Appellant's point about the necessary rotation of the commissioners is that the statute requires that one, and only one, jury commissioner be appointed every year, each such appointment to be for three years, so that the personnel of the commission would be before the court every year. Two of the commissioners serving when the grand jury was drawn in the case at bar, were appointed in the same year, 1948. The statute provides: "Such commissioners shall be appointed by the District Court of the United States for the District of Columbia, in general term, and shall serve for a term of three years and until their successors are appointed and qualified; except that the members first appointed shall serve for one, two, and three years, respectively, as may be designated by said court." [19]

This provision of the Code was first enacted in 1920, and that appointments are not now staggered is due to the fact that, when commissioners held over beyond their three-year terms, or died or resigned in the middle of their terms, their successors have been appointed not for the balance of the unexpired term but for a new term of three years.

In its ultimate analysis the question is whether an appointment made either upon a retirement mid-term or after a holdover pending qualification of a successor, was required to be for the balance of the unexpired term of three years or could be for a new term of three years. The District Court has consistently followed the latter view. We think that construction of the statute was permissible. We should note that appellant's position would require the invalidation of every indictment returned in this jurisdiction for the last twenty years.

We further observe that no allegation is made, or could be made under the circumstances, that appellant was prejudiced in any respect by the drawing of the grand jury by these particular commissioners.[20] Appellant attempts to distinguish the Agnew, Medley and Romney cases[21] on the ground that those cases relate to irregular performance of their duties by duly-appointed commissioners and do not govern the case of irregularity in the selection of the jury commissioners. He contends that in the latter case prejudice to the defendant need not be shown. He cites Dunn v. United States[22] in support of that contention. The Dunn case was expressly not followed in the well-considered case of Brookman v. United States,[23] and, like the Eighth Circuit, we find it not persuasive, especially in view of Rule 52(a).[24]

III

Appellant's third point is that the trial judge improperly restricted the cross examination of a Government witness, Special Agent Ellis. This witness testified, in the course of a long recital, that no threats were made to appellant in his presence, whereas, appellant says, it was established, in the absence of the jury, that such threats

18. D.C.Code § 11–1401 (1940) (Supp. VII).

19. Ibid.

20. Compare Agnew v. United States, 1897, 165 U.S. 36, 17 S.Ct. 235, 41 L.Ed. 624; Medley v. United States, 1946, 81 U.S. App.D.C. 85, 155 F.2d 857, certiorari denied, 1946, 328 U.S. 873, 66 S.Ct. 1377, 90 L.Ed. 1642; Romney v. United States, 1948, 83 U.S.App.D.C. 150, 167 F.2d 521, certiorari denied, 1948, 334 U.S. 847, 68 S.Ct. 1512, 92 L.Ed. 1771.

21. Ibid.

22. 5 Cir., 1917, 238 F. 508.

23. 8 Cir., 1925, 8 F.2d 803.

24. Fed.Rules Crim.Proc. rule 52(a), 18 U.S. C.A.

had been made in the witness's presence. Appellant sought to ask the witness in the presence of the jury about the episode which he (appellant) asserts was a threat. The purpose of the inquiry, defense counsel made clear, was not to establish that the threat was made but was to impeach the credibility of Ellis, "his lack of judgment, his bias, his hostility toward the appellant—even possibly his lack of truthfulness." The trial judge refused to permit the question.

This point concerns events which occurred after the affair at Blair House. Collazo was taken to Emergency Hospital, arriving there at approximately two-thirty in the afternoon. Accompanying him were Secret Service Agent Ellis and Detective Sergeant Tayman. Ellis was with Collazo until about eight o'clock that evening and was again with him the next day. Upon the trial, while Ellis was testifying, the court excused the jury and heard extended testimony as to questions asked Collazo and answers given by him after the shooting. Agent Ellis was asked whether he or anyone in his presence in any wise, either directly or indirectly, threatened or intimidated the defendant. He answered that no such threats were made. The question and answer were repeated in various forms. The following question was asked and answer given:

"The Court: Is it your testimony that during the entire time that you were with him, beginning at about half-past-two on November first, and ending, as you have indicated, sometime on November third, that never at any time, under any circumstances were there any threats made against him, made to him, express or implied, or any promises made to him, express or implied, or any intimations given to him that it might be better for him if he would make a statement?

"The Witness: That is my testimony. I might elaborate on that, that I told the defendant that he would undoubtedly be charged with first-degree murder." Subsequently the United States Attorney put Agent Ellis back on the witness stand and asked him to tell the court (the jury being still absent) about an incident involving Superintendent of Police Barrett. He said that Major Barrett and Inspector Storm came into the room at Emergency Hospital at about eight o'clock in the evening of the day of the shooting, that Major Barrett looked at Collazo and said, "That son-of-a-bitch should be dead." Ellis then testified: "He [Major Barrett] asked me if the defendant had told me the truth. I said I thought he had about the actual shooting, but that I didn't think he was telling me the truth about the Nationalist Party angle, and he turned to the man and he said: 'Why don't you tell the man the truth?' And that is all that was said."

Upon cross-examination defense counsel recalled to the witness his testimony that there had been no threat made to the defendant and asked him if he did not feel that what Major Barrett said was a threat. The witness said: "No, sir. I gave consideration and thought before answering the Court's question. I do not—I did not think at that time, and I still do not feel that Major Barrett's action was a threat, either express or implied." Ellis maintained the same position under repeated questioning of the same sort.

At the conclusion of the preliminary hearing, in the absence of the jury, the court restricted testimony concerning admissions or confessions by the defendant to those made before the Barrett incident, which in practical effect limited admissions to those made by Collazo prior to about three o'clock the afternoon of the shooting, at which time a sedative was administered to Collazo.

Later Ellis testified to the jury, relating what occurred from the time of Collazo's arrival at the hospital at approximately two-thirty until three-fifteen. He was asked whether prior to three-fifteen anyone in his presence, either directly or indirectly, had threatened or intimidated the defendant, and he replied that he made no threats or promises and that no one in his presence made any. Thereafter defense counsel, at the bench, told the court that he wanted to ask Ellis to relate to the jury the Major Barrett incident. Counsel did not then, and does not now, contend that any threats were made during the period covered by Ellis's testimony before the jury. His point

was and is that, since Ellis had originally testified (in the absence of the jury) that there had been no threats at any time, when as a matter of fact a threat had been made by Major Barrett late that evening, Ellis's credibility as a witness was affected. The court denied his request and would not permit the question.

Defense counsel now urge that the foregoing action by the trial court was an illegal restriction of the right of cross-examination and constitutes reversible error.

■ We think that the question proposed to be asked was of too remote pertinency to the credibility of the witness to have been permitted. The witness Ellis had a substantial basis for his position that Major Barrett's action did not constitute a threat. Defense counsel urge that, while possibly Major Barrett's first remark might not have constituted a threat, when the question, "Why don't you tell this man the whole truth?", was added, it did constitute the entire incident a threat. But that last remark must be placed in context. Ellis testified, as we have indicated, that, when Barrett asked him if Collazo was telling the truth, he told Major Barrett that Collazo had told the truth about the shooting. So Major Barrett's question was not related to the shooting but related to matters concerning the Nationalist Party in Puerto Rico. The trial judge held, as we have said, that Major Barrett's remark constituted a threat, but that ruling did not eradicate Ellis's original notion. After the court's ruling, Ellis did not repeat that no threats were made at any time.

■ The right of cross examination is a fundamental one in our jurisprudence,[25] and it may not be improperly restricted. But there are limits to the right, and a trial court has undoubted power to restrict it to proper bounds.[26] Particularly is it true that there are bounds to cross examination designed for impeachment of general credibility rather than for development of a contradiction upon a point in issue.[27] No point concerning threats was in issue before this jury. The court had excluded all statements made by Collazo after the Barrett incident, and it is not claimed by appellant that any threats were made prior to that time. Impeachment by contradicting a statement of fact made by a witness to a jury is one thing, and impeachment by showing that the witness spoke falsely upon another occasion, not in the presence of the jury and not concerning a fact in issue before the jury, is something else. In the former instance the accuracy of the testimony itself is involved; in the latter the impeachment is by way of the character of the witness or his general qualifications as a witness.[28] In the case at bar we have the latter instance. We do not approach the former problem, which might have arisen had the court permitted Ellis to testify in chief upon admissions made by Collazo during the evening or the next day. The answer to the problem as actually posed in the circumstances of this case, was clear. If, having made his initial ruling, the trial judge had nevertheless permitted the defense to inquire concerning the Barrett incident, the whole subject of questions to and admissions by Collazo during the evening hours of that day would have been opened up. No good purpose would have been served by that process. Moreover it should be noted that Agent Ellis did not testify concerning the shooting affair, and, still further, his testimony was corroborated in every material part by one or more of three other Government witnesses.

We agree with the trial judge that the effect of Ellis's original view of the Barrett incident upon the general credibility of his testimony was too remote to require that the question be permitted.

25. Alford v. United States, 1931, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624; Lindsey v. United States, 1942, 77 U.S.App.D.C. 1, 133 F.2d 368.

26. Glasser v. United States, 1942, 315 U.S. 60, 83, 62 S.Ct. 457, 86 L.Ed. 680; Viereck v. United States, 1942, 76 U.S. App.D.C. 262, 277–278, 130 F.2d 945, 960–961, reversed on other grounds, 1943, 318 U.S. 236, 63 S.Ct. 561, 87 L.Ed. 734.

27. Blitz v. United States, 1894, 153 U.S. 308, 311–312, 14 S.Ct. 924, 38 L.Ed. 725, 726; Harris v. United States, 1930, 59 App.D.C. 353, 41 F.2d 976.

28. 3 Wigmore, Evidence § 977 et seq. (3d ed. 1940); 3 id. § 1000 et seq.

## IV

Since the case presented upon the first count of the indictment is adequate to support the judgment, we need not consider other contentions made in respect to the proceedings under the other counts.[29]

## V

In accordance with our custom in capital cases, we have examined the entire record to ascertain whether in our view errors were made which were not called to our attention by counsel for the appellant. We found none.

The judgment of the District Court must be affirmed.

Affirmed.

## APPENDIX

During the course of the trial, on direct examination in the presence of the jury, Collazo was asked the following questions and gave the following answers:

"Q. This night of the twenty-ninth, you say he told you he had a gun, and you asked him to get you one, or it was agreed he would get you one? A. Yes, sir.

"Q. Did you give any money to purchase a gun with? A. Yes, sir; I gave him the money to buy the pistol, gave him fifty dollars.

\* \* \* \* \* \*

"Q. Now you spoke of this gun and the fact that he had a gun, and you were coming here to make a demonstration, why did you need guns to do that with? A. In the first place we figured out that a demonstration would never be serious enough—

"The Court: Would be what?

"The Witness: Would be serious enough to attract the attention of the American people if we were not hurt or wounded or killed in some way.

\* \* \* \* \* \*

"Q. After you left the hotel that afternoon of Tuesday (sic) November 1. A. There was something before that. We went around in a taxi and we had another walk to familiarize ourselves with the city. We had a long walk of about a mile or so and after that we went to lunch, and after we went to lunch we went back to the hotel and then from there we started to clean the guns and oil them and get everything ready, and after that then we planned—

"The Court: After that you what?

"The Witness: We did what we planned, which was to make a demonstration."

By Mr. Rover:

"Q. Now let me ask you, at that time did you know anything about the gun, as to how you shot it, how it was you handled it and so forth? A. No, sir, the two hours that we were in the hotel, Torresola showed me how to handle the gun, how to fire, how to handle it, how to insert the clip, take it out and put in—how to insert the bullets in the gun.

\* \* \* \* \* \*

"Q. Now you had started that, and I believe your plan was that Torresola was to approach and how you would approach. Suppose you go ahead from then on. A. We came to the vicinity of the Blair House, I don't know the place where it is, I know where there is a bank, I can recall that.

"Q. Where there is a garden? A. A bank, and from there we were going to the Blair House, after we had a better look at the Blair House, we went again to the same corner where we had been before and then we decided the best way would be for me to walk down toward the Blair House on the same sidewalk I was on, and it would be better for him, in other words, it would attract less attention if he were to go across the street and walk down and then cross again and come toward the Blair House and meet me in front of the Blair House.

\* \* \* \* \* \*

"Q. \* \* \* Now did you keep Torresola under your observation until you got up to 17th Street? A. Yes, sir, I did.

"Q. And did you notice that there was a guard box or sentry box on the east side— have you got a picture there?

\* \* \* \* \* \*

29. Borum v. United States, 1932, 284 U.S. 596, 52 S.Ct. 205, 76 L.Ed. 513; Dunn v. United States, 1932, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356.

"Q. Where was it you and Torresola intended to meet in front of the Blair House? A. At the main entrance of the Blair House.

"Q. Did you know that Torresola was going to shoot Coffelt? A. No, sir, I didn't know it.

\* \* \* \* \* \*

"Q. Now, then, you were at that point in between the tree and the iron railing. What did you then do? A. I watched Torresola on the other side. When I saw that, I didn't walk towards the man, I walked towards Mr. Birdzell, Torresola approached me.

\* \* \* \* \* \*

"The Witness: I stepped forward, I took my gun out and I pointed it at him and I tried to fire the first time, but it didn't go off and I am sure that Mr. Birdzell saw me put my left hand up, and before I fired the second time. And when I fired the second time the pistol went off and he was wounded in the leg.

\* \* \* \* \* \*

"Q. Now, what did you do next? A. As I told you before, I watched him for a few seconds and then I saw him struggling to get up and take his gun out and I thought he would not be able to take it out, and I think I turned my back on him and walked over to the side of the Blair House.

"Q. And what happened then? A. When I walked over to the steps this man here in the guardhouse started to shoot, and of course I returned his fire.

\* \* \* \* \* \*

"Q. And what happened to you next? A. When I saw my pistol was empty I stopped on the second step of the Blair House to put a new clip in the pistol when I had that ready I got up again and I tried to shoot—to fire again until I didn't have a chance to fire again until I didn't have a chance to fire more than one or two times, I was shot and fell down.

\* \* \* \* \* \*

"Q. Did you intend to kill Mr. Birdzell? A. No, sir.

\* \* \* \* \* \*

"Q. What was your intention when you went to the steps of the Blair House? A.

Our intentions were to make a demonstration on the steps of the Blair House. In the Blair House was the residence of the President of the United States and we wanted the American people and the people of the world to know that Puerto Rico was a possession of the United States and that at that time, particularly, the Puerto Rican people were being murdered by the American authorities in Puerto Rico, we wanted them to realize that."

On cross examination Collazo testified, in part, as follows:

"Q. On October 29th you asked Torresola to get you a gun? A. I did, yes, sir.

\* \* \* \* \* \*

"Q. The 30th? On October 30th he gave you a gun, did he? A. Yes, sir, he did.

\* \* \* \* \* \*

"Q. You got ammunition later from him? A. Yes, sir.

"Q. That night you planned what you call a demonstration, is that right?

\* \* \* \* \* \*

"A. The 30th, yes, sir.

\* \* \* \* \* \*

"Q. The following morning, on November 1, you and Torresola took out your guns and oiled and cleaned them that morning, that is correct, sir?

\* \* \* \* \* \*

"A. About noon.

\* \* \* \* \* \*

"Q. Torresola showed you how to handle that gun in the Harris Hotel? A. Yes, sir, he did.

"Q. Did he give you ammunition at that time? A. Yes, sir.

\* \* \* \* \* \*

"Q. And you knew that the clips were loaded that morning? A. Yes, sir, I knew.

"Q. Did Torresola tell you they were loaded? A. Surely.

\* \* \* \* \* \*

"Q. And showed you how to insert the clip in the P–38? A. Yes, sir, he did.

"Q. And showed you how to hold the P–38? A. To handle it.

\* \* \* \* \* \*

"Q. You saw him with the loaded clips for his gun at the time he gave you the loaded clips? A. Yes, sir.

"Q. You were in agreement at that time, weren't you? A. I think we were in agreement at that time, yes, sir.

\* \* \* \* \* \*

"Q. And then you walked up to where you could see the Blair House? A. Yes, sir.

\* \* \* \* \* \*

"Q. Did you know that there was a guard in that booth? A. I think I knew it, I had an idea that there was at least one in each booth.

\* \* \* \* \* \*

"Q. You knew that they were guarding the Blair House? A. I suppose they were guarding it.

"Q. You and Torresola after looking it over and seeing where those guards were you agreed that he should cross the street, is that right? A. Yes, sir.

\* \* \* \* \* \*

"Q. Then when Torresola walked across the street there you had him under your observation and watched him walk across the street, did you not? A. Yes, sir.

"Q. And you watched until he reached in front of the building there, the Court of Claims Building on the upper side of the Blair House, didn't you? A. I think I saw him; yes, sir.

"Q. And you then saw him walk down Pennsylvania Avenue, east on Pennsylvania Avenue toward the direction in which you were standing down here? A. Yes, sir, that was the last time I saw him.

"Q. Who fired the first shot? A. I did.

"Q. Your gun didn't go off with the first shot, did it? A. No, sir. Anyway, I tried to shoot the first shot.

"Q. You aimed it at Officer Birdzell who was standing in the center stairway of the Blair House? A. Yes, sir, I did.

"Q. You meant to hit him? A. I meant to hit him.

"Q. You did hit him? A. I did.

\* \* \* \* \* \*

"Q. You fired at three officers there that day, Birdzell in the stairway, and then at Officer Davidson and Agent Boring at the booth, at the police booth at the east end of the Blair House, didn't you? A. Sure.

"Q. You stated that the demonstration would not be serious unless someone was wounded or killed, didn't you, yesterday afternoon in response to Mr. Rover's question? A. I might have said that; I might have.

"Q. Did you believe that? A. Yes, sir, I believed that.

"Q. Did you see Torresola fire his gun at all? A. No, I never saw Torresola after that time that I told you.

"Q. He told you he was going to fire his gun though before he left the hotel on your way up there? A. I don't think he did, no, sir.

"Q. Did you tell him you were going to fire your gun? A. Yes, sir, I told him.

"Q. What did Torresola have his gun for, then? A. For the same reasons—

"Q. You were going to take equal parts in this demonstration, is that your testimony? A. Yes, sir."