**Robert E. ASKINS, Appellant,**

v.

**UNITED STATES of America, Appellee.**

No. 12599.

United States Court of Appeals
District of Columbia Circuit.

Argued Oct. 5, 1955.

Decided Feb. 14, 1956.

Fahy, Circuit Judge, dissented.

Messrs. Leonard S. Hayes and John A. Shorter, Jr., Washington, D. C., with whom Mr. George E. C. Hayes, Washington, D. C., was on the brief, for appellant.

Mr. Fred L. McIntyre, Asst. U. S. Atty., with whom Messrs. Leo A. Rover, U. S. Atty., Lewis Carroll and Thomas A. Flannery, Asst. U. S. Attys., were on the brief, for appellee. Mr. Harold H. Greene, Asst. U. S. Atty., also entered an appearance for appellee.

Before PRETTYMAN, FAHY and DANAHER, Circuit Judges.

DANAHER, Circuit Judge.

Appellant was indicted [1] on a charge of first degree murder.[2] At the trial he relied upon insanity as a defense. After the jury had been fully instructed on all elements of the case, a bench colloquy occurred. The Government then requested that the jury be instructed as to the elements of murder in the second degree. With much misgiving, as the transcript discloses, the trial judge decided "out of an abundance of caution" to grant the Government's request. The jury returned a verdict of guilty in the second degree after which appellant was

1. The indictment reads, in pertinent part: "On or about December 28, 1938, within the District of Columbia, Robert E. Askins purposely murdered Ruth McDonald by means of poison, of which poisoning the said Ruth McDonald, on or about December 29, 1938, did die."

2. The statute in effect in 1938, and under which Askins was indicted reads:

"Whoever, being of sound memory and discretion, purposely, and either of deliberate and premeditated malice or by means of poison, or in perpetrating or in attempting to perpetrate any offense punishable by imprisonment in the penitentiary, kills another, is guilty of murder in the first degree." D.C.Code, § 6–21 (1929).

sentenced to imprisonment for a term from fifteen years to life. Appellant seeks reversal on two grounds, one, that there was inadequate evidence of the possible intoxication of the appellant to justify a second degree charge; and second, that the second degree instruction as given failed to define an element of the crime and was given out of context with the general charge.

The alleged crime was committed on the evening of December 28, 1938. Appellant, then about 20 years old, and in junior year at college, took two drinks from a bottle of whiskey and refilled the bottle with potassium cyanide. Thereafter, encountering a streetwalker, he accompanied her to a house where, after relations with her, he, at her request, poured drinks for five "girls" and one for himself. Proposing a toast, appellant laid his wallet on a table and offered a money reward to the woman who first drank her whiskey "right down." Ruth McDonald "directly" drank all hers, but the other girls began to spit out what they had taken, and appellant left the premises.

Antidotes having been administered to all but Ruth McDonald, one Ethel Prince from the glasses poured back into the bottle the remaining whiskey, which upon analysis by a police chemist, was found to contain 2.9 per cent of potassium cyanide. By the time an ambulance arrived a few hours later, Ruth McDonald had died.

Appellant, who had served as an informant to police, told an officer for whom he had worked, that he had contracted a disease not too long before the episode described. Placing the blame for his disease on a streetwalker, it was his intention, as testified, to give the poison in whiskey "to kill them all at one time if he could, and he further stated that he intended, his intention was to kill all the prostitutes in town if possible."

So much for the crime and its background, *as of 1938*, except for certain details of a confession which will hereinafter be discussed. In due course, ap-

pellant was examined by psychiatrists. By March 15, 1939, it was determined that appellant was suffering from dementia praecox of the catatonic type. He was admitted to St. Elizabeth's Hospital on April 12, 1939, where he remained until 1953. As of August 20, 1954, appellant was found competent to stand trial and to assist in his own defense.

Trial began January 31, 1955, in the course of which the defense of insanity was offered. Much conflict of professional opinion turned on whether the accused could be said to have been incompetent on the date of the alleged crime, as distinguished from his having developed insanity because of his subsequent incarceration. There was a basis in the evidence for each of these points of view.

There had been offered no evidence that the accused was intoxicated, indeed one of the principal eyewitnesses for the Government testified that there was no indication that the accused had been drinking. The trial judge had instructed the jury "that this was a case of first degree murder or nothing." Upon reconsideration of the possible effect of certain statements made by the accused in his confession, the trial judge further instructed that the jury might consider those statements. He then said:

"* * * that murder in the second degree under the circumstances of this case may be an unlawful killing of a human being by another with malice, bearing in mind what I have told you about malice, but without a purpose or intent to kill, as when the act which imports danger to another is done so recklessly or wantonly as to manifest depravity of mind or disregard of human life.

"The statements that I have reference to are these:

"'Question: But you did realize the danger to yourself when you poured yourself a drink and carried it to your mouth and failed to drink, didn't you?

" 'Answer: I did not realize the danger I was in as I was in such a bad condition.

" 'Question: Didn't you know that the cyanide was still in the whiskey that you offered these girls to drink?

" 'Answer: It was the whiskey I had drank. I was in such a condition that I didn't realize it.

" 'Question: Were you drunk on the night of December 28, 1938 when you went into the house with the girl?

" 'Answer: I wasn't staggering. I could feel a sensation in my head.'

"So that if you believe and believe beyond a reasonable doubt, ladies and gentlemen of the jury, that there was an unlawful killing in this case by the defendant of Ruth Mc-Donald with malice but that the defendant's condition was such at that time that he could not entertain an intention or purpose to kill, but that in mixing the potassium cyanide and the whiskey together and going to the place and pouring it into the glass was an act which imported danger to others and was done so recklessly or wantonly as to manifest depravity of mind—and I do not mean unsoundness of mind when I use the term depravity of mind—or an utter disregard of human life, of course, under those circumstances it would be your duty under the law to return a verdict of guilty of murder in the second degree, under the circumstances of this case.

"Of course, if you have a reasonable doubt—

\* \* \* \* \* \*

"The Court: As I was saying, of course, if you have a reasonable doubt about it, or do not believe it, you must find him not guilty, or if you believe he was of unsound mind at the time, you must return a verdict of not guilty by reason of insanity.

"Briefly, to summarize, you can return a verdict of guilty as indicted of first degree murder, or you can return a verdict of guilty of second degree murder, or you can return a verdict of not guilty, or a verdict of not guilty by reason of insanity, all depending on how you view the evidence in the case."

In view of the defense of insanity, the trial judge was most explicit and charged at length upon this phase of the case. The jury was told:

" \* \* \* [I]f you reach the conclusion that the defendant was of unsound mind at the time of the alleged commission of the crime, that ends it, and your verdict shall be not guilty by reason of insanity. If you are satisfied beyond a reasonable doubt that at the time the crime was committed that the defendant was of sound mind, you will pass to a consideration of the indictment to determine the guilt or innocence of the defendant."

The division of the instructions into two portions, thus noted, put squarely before the jury the point upon which the case would turn. If the jury found the accused to have been insane at the time of the crime, that ended it. The jury was to go no farther. We cannot doubt where the instructions were so clear, that the jury rejected the defense of insanity. So it was that the jury was to enter upon consideration of the next phase of the case.

The jury had been given the background of differing classes of homicides at common law, those deemed criminal and those deemed justifiable, all to the jury's proper understanding of what was to follow. The instructions proceeded:

"Now, as time went on, the various states, including the District of Columbia, divided this crime of murder into two degrees, first degree murder and second degree murder, and each was characterized by a particular element or elements, and the absence of a premeditated

design to take life characterizes second degree murder and distinguishes it from first degree murder, and as I said, malice is an essential ingredient or element of murder.

"Now, what is malice?"

The jury was then instructed as to the place of malice or the effect of its absence in the jury's evaluation of the degree of crime. Against the use by the statute of the word "purposely," its meaning was explained. The trial judge granted all requests submitted by the defense, and the charge was concluded. There can be no doubt that the instructions were correct and adequate for the guidance of the jury. Indeed, counsel makes no attack upon the charge, either as to the instructions concerning first degree murder or those as to insanity as a defense. Rather, and we think properly, appellant's brief says of the charge up to the point next to be discussed: "It was * * * clear, cogent and complete."

In a bench colloquy Government counsel renewed his previous requests for an instruction on second degree murder based upon the possibility that the liquor consumed by the accused had rendered him incapable of formulating a "purpose," within the meaning of the statute. He cited Jordon v. United States, 1936, 66 App.D.C. 309, 87 F.2d 64, certiorari denied, 1938, 303 U.S. 654, 58 S.Ct. 762, 82 L.Ed. 1114. He called attention further to Sabens v. United States, 1913, 40 App.D.C. 440. There, at page 443 this court said:

"While intoxication constitutes no excuse or justification for crime [citations], nevertheless, when the very nature and essence of the crime is made to depend upon the condition of mind at the time, the *fact* of intoxication is a proper subject of consideration in the determination of the question whether a particular crime has been committed."

Finally convinced, as previously noted, that the defendant was entitled to a second degree instruction although based upon statements appearing in a confession offered by the Government, the trial judge told the jury his understanding of the Jordon case "where certain statements were made by Jordon in his alleged confession that he was excited and fired the shot unintentionally. The Court of Appeals held in that case that if the jury believed his statement then he should not have been convicted of murder in the first degree." "Under those circumstances" he permitted the jury to take into consideration "certain statements made by the defendant in his alleged confession, if you believe that the statements were given while he was of sound mind and discretion * * *."

Thereupon, the judge listed for the jury the statements upon which he relied, previously set forth in full. Yet other portions of the confession have a possible bearing upon appellant's state of mind, and some of them will be noted.

Appellant in his confession had explained his original purpose was to commit suicide because of disgust growing out of his past relations with prostitutes. "Not a habitual drinker," he said, he first drank the whiskey to steel himself to take potassium cyanide mixed with the remaining whiskey. While waiting for the whiskey to take effect, he walked around, and at that time encountered the woman whom he accompanied to the scene of the crime. There "She saw the bottle sticking out of my coat pocket and she asked me to give her and her friends a drink. * * * Then she took the bottle out of my coat pocket and went into the next room. * * * I told [the police officer] that it was not my intention when I left the house to harm anyone except myself, but that I had drank quite a bit out of the bottle * * *."

The officer interrogated Askins:

"Question: * * * why did you pour out several glasses and permit them to drink it in your presence and you know it to be poison?

"Answer: The only possible explanation I can give for that is that the whiskey I had drank before I went to the house had made me unaware of the danger I was exposing these women to, as I ordinarily do not approve of mistreating women. When the woman made mention of the fact that the whiskey had a peculiar taste, I told them to hold everything. * * *"

Appellant concluded his confession:

"If I was in the state of mind that I am now and knew that the whiskey contained cyanide, I would not have permitted them to drink it, as I think that they should be taught how to work other than by selling themselves. I would not knowingly harm any woman. That's all."

■ We have been at some pains to supply a rather complete background, for appellant has earnestly contended that the judge erred in expanding his earlier references to what constitutes a basis for a second degree conviction. It seems clear beyond peradventure that the trial judge was instructing the jury in terms of the appellant's state of mind. If he lacked "an intention or purpose to kill," and the jury should so find, (as it did), it followed that the Government's proof in support of the first degree indictment failed to establish that the poison was administered "purposely," as that word appeared in the statute.

"This purpose to kill, in the view we take of the statute, is a state of mind which must be proved as a fact before there may be a conviction of first-degree murder * * *." [3] The trial judge properly granted the Government's request.

■ Appellant argues that in any event, the charge was incorrect in its failure to spell out the degree of intoxication which must have overcome the accused. He would have us say, in effect, that before the degree of murder could be reduced, the evidence should have been sufficient to establish that Askins was so drunk that he was "incapable of consciousness that he [was] committing a crime,—incapable of discriminating between right and wrong." [4] He argues further that unless the accused had been shown to have been so intoxicated, it was improper and prejudicial to deprive him of the opportunity to receive a verdict of guilty in the first degree, or not guilty, or not guilty by reason of insanity as to the first degree count only.

Appellant's defense had been predicated upon insanity, not upon such intoxication of the accused as would render him incapable of acting purposely or of forming intent.[5] Of course, if there had been no evidence of drinking, there would have been no basis for a reference to, much less an instruction on the point. But here, unlike the Bishop case, note 5, *intoxication* was *not* the issue. The appellant's state of mind in terms of the word "purposely" *was* in issue, and it was a question of fact for the jury to resolve whether the accused possessed a purpose to kill, irrespective of his drinking.[6] If the Government had proved that appellant while sane had purposely administered poison to Ruth McDonald, appellant was guilty of murder in the first degree. But if the proof failed to establish purpose, appellant still could

---

3. Jordon v. United States, 1936, 66 App. D.C. 309, 311, 87 F.2d 64, 66, certiorari denied 1938, 303 U.S. 654, 58 S.Ct. 762, 82 L.Ed. 1114.

4. Goodall v. United States, 1950, 86 U.S. App.D.C. 148, 152, 180 F.2d 397, 17 A.L. R.2d 1070, certiorari denied, 1950, 339 U.S. 987, 70 S.Ct. 1009, 94 L.Ed. 1389.

5. Ryan v. United States, 1905, 26 App.D.C. 74, 81; Sabens v. United States, 1913, 40 App.D.C. 440; Edwards v. United States, 1949, 84 U.S.App.D.C. 310, 172 F.2d 884; Bishop v. United States, 1939, 71 App.D.C. 132, 135–136, 107 F.2d 297.

6. Cf. Goodall v. United States, 1950, 86 U.S.App.D.C. 148, 152, 180 F.2d 397, 17 A.L.R.2d 1070, certiorari denied, 1950, 339 U.S. 987, 70 S.Ct. 1009, 94 L.Ed. 1389, where the accused maintained he did not commit the crime and retained possession of his faculties at all times.

have been found guilty of murder in the second degree.[7]

■■ It is true that the portion of the charge of which appellant complains was added after the judge had apparently completed his instructions. But we do not agree that it was out of context. It was linked directly with various portions of the earlier instructions in which second degree murder was discussed.[8] The charge must be considered as a whole,[9] and so viewed, we find no error.

Affirmed.

FAHY, Circuit Judge (dissenting).

The evidence of insanity should be dispositive of the case. The homicide, for which Askins was tried in 1955, occurred December 28, 1938. He was arrested the next day. Because of his mental condition he was admitted to Gallinger Hospital February 3, 1939. Examinations and observations between then and March 15, 1939, led to a lunacy inquisition. As a result, on March 31, 1939, he was formally found to be insane. He was admitted to St. Elizabeths Hospital in April, 1939, where he remained continuously as a mental patient for thirteen years, until February 20, 1952. On June 1, 1954, he was indicted for another crime, and on June 25, 1954, the District Court ordered him recommitted to St. Elizabeths in order to determine his competency to stand trial. On October 4, 1954, the court found that he was competent to stand trial. Accordingly he was transferred to the jail. On November 9, 1954, the indictment for the other crime was dismissed on motion of the United States; but meanwhile, on November 1, 1954, he had been reindicted for the 1938 homicide. He was tried January 31 to February 8, 1955.

Three doctors testified at the trial. All agreed Askins had been suffering from dementia praecox. The most important testimony on his mental condition was that of the doctor who was chief psychiatrist at Gallinger in 1939. He had conducted the examination of Askins during the period from February 3, 1939, less than a month and a half after the homicide, to March 15, 1939. He testified that Askins was insane when he committed the homicide December 28, 1938. One of the other doctors testified without having made a personal examination of appellant and without having examined the records at St. Elizabeths. He apparently relied solely upon the Gallinger records and upon information given him by the United States Attorney's Office. The thrust of his testimony was that on the basis of the records submitted to him "there was nothing to indicate * * * psychotic symptoms on that particular date [December 28, 1938]." The third doctor had no independent recollection of examining appellant, but the records indicated that he had been present at appellant's admission conference at St. Elizabeths in June, 1939. He did not see the records of Gallinger Hospital. He testified that when he saw appellant at St. Elizabeths he had symptoms of dementia praecox, but that from that examination he could not express an opinion as to appellant's mental condition at the time of the alleged crime. He also testified that when he was asked for an opinion about the mental condition of an individual he "certainly usually examine[s] the person." Somewhat paradoxically, however, in reply to a question which assumed the only relevant facts to be those with which he was familiar, he said, "there was nothing in the data of that hypothetical question that indicated to me that that person was suffering from any mental illness."

---

**7.** Id., 86 U.S.App.D.C. at page 151, 180 F. 2d 397; cf. Owens v. United States, 1936, 66 App.D.C. 104, 85 F.2d 270, certiorari denied, 1936, 299 U.S. 540, 57 S.Ct. 23, 81 L.Ed. 397.

**8.** Moreover, at the conclusion of the added instruction the trial judge asked: "Does

that take care of everything?" No objection or criticism was voiced. Cf. Boyd v. United States, 1926, 271 U.S. 104, 108, 46 S.Ct. 442, 70 L.Ed. 857.

**9.** Kinard v. United States, 1938, 69 App. D.C. 322, 101 F.2d 246.

All the testimony, of course, was given some sixteen years after the homicide. Considering the evidence as a whole, including the chronology of events which from a time shortly after the homicide carried appellant through approximately fourteen years of treatment as an insane person, I do not understand how it could reasonably be said that a jury in 1955 could find beyond a reasonable doubt that appellant was sane when the homicide occurred. He need not have been released from custody had he been acquitted solely on the ground of insanity. The statute in effect at the conclusion of the trial, § 24–301, D.C.Code (1951), provided that the court could certify the fact of such acquittal to the Federal Security Administrator, who could order him to be confined in a hospital for the insane.[1] This provision should have controlled appellant's custody, not the law applicable to the imprisonment of persons mentally responsible under the criminal law.

I must mention still another matter, although it has not been previously raised. The Sixth Amendment to the Constitution provides that an accused shall enjoy the right to a speedy trial.[2] Appellant was originally indicted February 1, 1939 for the homicide here involved. He was never tried under that indictment. It was nolle prossed August 17, 1943, no doubt due to appellant's mental condition. It was eleven years later, November 1, 1954, when he was reindicted. This was also two years after he had been discharged from St. Elizabeths, to which he was recommitted June 25, 1954. His trial, as has been said, was about sixteen years after the commission of the homicide and after the first indictment. Clearly appellant did not have a speedy trial; and clearly the delay prejudiced him in his defense of insanity; furthermore, several of the witnesses stated that they had no independent recollection of the events about which they were testifying, but had to rely on reports and records. The wisdom of the constitutional provision is illustrated by this case and the provision should be made effective. While the delay was not the fault of the United States, as it was held to be in Petition of Provoo, D.C.D. Md., 17 F.R.D. 183, affirmed without opinion United States v. Provoo, 350 U.S. 857, 76 S.Ct. 101 and was due primarily to the insanity of the accused, there was not a speedy trial in fact, and I think it follows in the circumstances here disclosed that there was not a speedy trial in law. It cannot be said Askins waived his constitutional right by not requesting an earlier trial, for he was committed to St. Elizabeths within a few months of the homicide and the indictment then pending was nolle prossed in 1943. He was not reindicted until 1954. He certainly did not forfeit his constitutional right by not himself initiating a request to be tried either while he was insane, or after the elapse of fifteen years, when he was reindicted.[3]

1. An amendment of August 9, 1955 provides that the court *must* order such a person to be confined in a hospital for the mentally ill. Pub.L. No. 313, 84th Cong., 1st Sess., 69 Stat. 609.

2. "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial * * *." U.S.Const. amend. VI.

3. The date appellant was formally found to be insane, March 31, 1939, and the facts we have set forth regarding his indictment for another crime, his recommitment, the finding of competency to stand trial, his transfer to jail, and the dismissal of said indictment, are not shown by the record now before us but are in the records of the United States District Court for the District of Columbia, of which I take judicial notice.