**William C. COLEMAN, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 15915.**

United States Court of Appeals
District of Columbia Circuit.

Argued Jan. 11, 1961.

Decided Sept. 8, 1961.

Petition for Rehearing En Banc
Denied Oct. 10, 1961.

556

Mr. Edward Bennett Williams, Washton, D. C. (appointed by this court), for appellant.

Mr. Nathan J. Paulson, Asst. U. S. Atty., with whom Messrs. Oliver Gasch, U. S. Atty., at the time the brief was filed, Carl W. Belcher, Asst. U. S. Atty., at the time the brief was filed and Daniel J. McTague, Asst. U. S. Atty., were on the brief, for appellee.

Before WILBUR K. MILLER, Chief Judge, and EDGERTON, PRETTYMAN, BAZELON, FAHY, WASHINGTON, DANAHER,

BASTIAN and BURGER, Circuit Judges, sitting *en banc*.

DANAHER, Circuit Judge.

The first count [1] of a six count [2] indictment charged: "On or about January 7, 1960, within the District of Columbia, William C. Coleman, otherwise known as William Carroll Coleman and Ray S. Coleman, otherwise known as Raymond S. Coleman, perpetrated a robbery by stealing, taking and carrying away, by force and violence and against resistance and by sudden and stealthy seizure and snatching and by putting in fear, from the person and from the immediate actual possession of Benjamin Bookoff, property of Benjamin Bookoff, of the value of about $197.00, consisting of $197.00 in money; and in perpetrating that robbery William C. Coleman, otherwise known as William Carroll Coleman and Ray S. Coleman, otherwise known as Raymond S. Coleman, at the time and place aforesaid, unlawfully and feloniously did murder Donald J. Brereton by means of shooting him with a pistol." A third count charged both brothers with robbery. Ray Coleman was acquitted of the murder charge but was convicted of robbery and has not appealed. William C. Coleman was convicted of both offenses as charged and was allowed to appeal in forma pauperis. We appointed present counsel.

Officer Brereton and Officer Winters on January 7, 1960, had volunteered to participate in a "stake-out," in an effort to thwart a possible robbery. They ac-

1. D.C.Code, § 22–2401 (1951) in pertinent part reads: "Whoever * * * without purpose so to do kills another in perpetrating or in attempting to perpetrate * * * robbery * * * is guilty of murder in the first degree."

2. The second count had charged that the accused "purposely and with deliberate and premeditated malice" had murdered Donald J. Brereton.

   As the trial commenced, the prosecution moved for leave to dismiss the second count. When appellant's trial counsel stated "We have no objection, your Honor," the motion was granted. Later, that same day, appellant's trial counsel

asked that the premeditated first degree murder charge be reinstated that the jury might have the opportunity to bring in a finding of homicide in a less degree. "We would like the jury to have that choice," counsel stated. Of course, the jury would have had that "choice" only if the evidence justified an instruction with respect to a lesser included offense. See note 20 infra, and discussion in text, Part III infra.

   The motion for reinstatement of the second court was denied. No error has been assigned with respect to that ruling. Counts 4, 5 and 6, not material to our problem, were likewise dismissed.

quainted Benjamin Bookoff with their plan as they secreted themselves in the rear of his liquor store. About 7 P.M., two men, later identified as the Coleman brothers, entered the store. William ordered a bottle of whiskey and tendered a bill in payment. Ray Coleman pointed an automatic pistol at Bookoff and ordered him to lie on the floor. Bookoff called out "They are here," as William from the cash register seized money said by Bookoff to total $197. The police officers commenced to emerge from the rear room as the two robbers fled from the store, separating outside and running in opposite directions.

Appellant, William C. Coleman, ran north, diagonally across Fifth Street toward an alley, which opened from the street in an easterly direction. Both officers pursued William Coleman. Officer Winters in the lead, called "Stop, Police." When the robber failed to stop, Officer Winters fired a shot.

William Coleman then reached a second alley which intersected the first at right angles, and turned, running south, as the officer again called "Stop, Police," and fired a second shot.

As the chart in our appendix makes clear, the last mentioned alley at the point of intersection is 15 feet wide. On the west side is an anchor wire fence. On the east side is a building, the wall of which runs 40 feet to a corner, then east 8 feet. The alley from that point to its southern outlet is 23 feet wide. From his experience in patrolling that beat, Officer Winters was aware of the off-set area. Since he no longer could hear William Coleman running or see him in the alley, he expected Coleman had turned the corner and would there be found.

Officer Winters slackened his speed, made his way along the anchor fence, and reached a point opposite the corner of the wall. He saw Coleman some 20 feet away against the wall. Winters pointed his revolver at Coleman and said "This is the Police. Put your hands up."

Just then, the rookie Officer Brereton, still running but on the east side of the alley near the wall, reached the corner. With his revolver in his hand, he came thus between Winters and Coleman. The latter reached out, grabbed Officer Brereton, spun him around and a shot followed.*

Officer Brereton was felled by a bullet from his own gun. Officer Winters moved in to help. Coleman had wrested Brereton's gun from him, and thereupon pointed it with arm extended at Officer Winters. At close range he fired a shot at Winters who fell, the bullet having struck him first in the chin, then reentering his neck and passing through his body and out his back. Coleman fired a third shot. Brereton was later found to have been mortally wounded twice. The appellant fled and made good his escape, still carrying Officer Brereton's revolver which he later concealed in an abandoned car where it was found next day.

■ Other details will be interpolated as and when deemed necessary to our discussion, but such in broad outline were the facts from which the jury deduced William C. Coleman's guilt as to the robbery and felony-murder counts. The robbery, the asportation of its fruits, the immediate pursuit, the savage and desperate attempt by Coleman to shoot his way to freedom and his escape formed one continuous and unbroken chain of events. We are in accord that from all the evidence Coleman was overwhelmingly shown to be guilty as charged but we turn to a consideration of various contentions raised before us.

---

* On cross-examination, Officer Winters was asked: "Q. Was the man at his side when he grabbed him? A. Yes.

"Q. You think he grabbed Brereton from the side? A. I think he grabbed his gun."

Officer Brereton, it should be noted, was about six feet, one inch tall, and weighed about 185 pounds. But, still on cross-examination Officer Winters testified, Brereton was about an inch or so shorter than Coleman, who also appeared broader and heavier than his victim.

## I

■ Appellant attacks the verdicts as inconsistent as to the two co-defendants, both of whom could have been found guilty of murder. It may seem illogical, as contended, that the jury returned a not guilty verdict on the felony-murder count [3] as to Ray S. Coleman, since both accused were found guilty of robbery. It was, nevertheless, entirely within the prerogative of the jury to acquit on the murder charge as to Ray Coleman, who had not been present at the scene of the killing, and to return a verdict of guilty as to the appellant. William C. Coleman testified, freely admitting his participation in the robbery. He described his flight, indicated his course on the chart, and submitted his version of how immediate pursuit resulted in his grappling with the officer and the shooting. As to the appellant, the chain of circumstances may well have seemed to the jury unbroken and continuous and to have brought the case squarely within the statute and the rule we have previously announced.[4] Thus viewed, there is no inconsistency in the verdict as to the appellant.[5] "Whether the jury's verdict was the result of carelessness or compromise or a belief that the responsible individual should suffer the penalty * * * is immaterial. Juries may indulge in precisely such motives or vagaries. Dunn v. United States, 284 U.S. 390 [52 S.Ct. 189, 76 L.Ed. 356, 80 A.L.R. 161]." United States v. Dotterweich, 1943, 320 U.S. 277, 279, 64 S.Ct. 134, 135, 88 L. Ed. 48. Cf. Hoag v. State of New Jersey, 1958, 356 U.S. 464, 472, 78 S.Ct. 829, 2 L. Ed.2d 913.

## II

■ Appellant argues that he could not properly be convicted of first degree murder on the first count of the indictment which omitted the words "being of sound memory and discretion." On brief he tells us he makes no contention that such omission "invalidates the indictment and requires its dismissal." Correctly he recognizes that such "a contention was rejected in Hill v. United States, 22 App.D.C. 395, 400–402 (1903)." There, the court pointed out, the District of Columbia had taken the common law of Maryland in 1801, and since had followed it. The definition of murder found in the Code in 1903 was that of the common law, and it was "not necessary, in any view of the case, to charge that the accused was of sound mind and discretion, as essential to the validity of the indictment." The view then expressed, unimpaired by any holding of this court over the intervening years, must be considered also in light of the fact that we are treating here of felony-murder. "The applicable statute in the District of Columbia defines murder in the first degree as the killing of another while armed with or using a dangerous weapon in the perpetration or attempted perpetration of a robbery." [6]

Appellant concedes he was "validly indicted for something," but asks on brief "was it for first degree or second degree murder?" There is in our minds no room

---

3. Certainly the jury could have returned a felony-murder verdict of guilty as to both accused since both had participated in the same robbery. Wheeler v. United States, 1947, 82 U.S.App.D.C. 363, 367, 165 F. 2d 225, 229, certiorari denied 1948, 333 U.S. 829, 68 S.Ct. 448, 92 L.Ed. 1115.

4. Carter v. United States, 1955, 96 U.S. App.D.C. 40, 223 F.2d 332, certiorari denied 1956, 350 U.S. 949, 76 S.Ct. 324, 100 L.Ed. 827, discussed in Part III infra.

5. On the other hand, compare Askins v. United States, 97 U.S.App.D.C. 407, 231

F.2d 741, certiorari denied 1956, 351 U.S. 989, 76 S.Ct. 1054, 100 L.Ed. 1502; Green v. United States, 1955, 95 U.S.App. D.C. 45, 46, 218 F.2d 856, 857.

6. Mumforde v. United States, 76 U.S. App.D.C. 107, 109, 130 F.2d 411, 413, certiorari denied 1942, 317 U.S. 656, 63 S.Ct. 53, 87 L.Ed. 527; Carter v. United States, supra note 4; and see the indictment and discussion in Goodall v. United States, 86 U.S.App.D.C. 148, 150, 151, 180 F.2d 397, 399, 400, 17 A.L.R.2d 1070, certiorari denied 1950, 339 U.S. 987, 70 S.Ct. 1009, 94 L.Ed. 1389.

for doubt as to the offense charged. The appellant was charged with murder in the first degree.[7]

## III

We come, accordingly, to appellant's contention that the trial court erred in failing to instruct the jury it might return a verdict of second degree murder or of manslaughter. No reference was made in the charge to these lesser crimes, but in our view the issue was squarely submitted to the jury in terms of the statute [8] which defined the offense and in light of the evidence which required a finding either of guilty or not guilty—nothing else.

This court following Stevenson v. United States, 1896, 162 U.S. 313, 323, 16 S. Ct. 839, 40 L.Ed. 980, long since ruled that one charged with murder in the first degree was entitled to instructions permitting a jury verdict on lesser included degrees of homicide when the evidence so justified.[9] Moreover, before the District of Columbia Code was amended in 1940,[10] a killing in the perpetration of a robbery constituted murder in the first degree only if done *purposely*. If the killing were by accident or otherwise, even in the course of a robbery, it was not murder in the first degree.[11]

The Attorney General referred to the Jordon case in his recommendation that the District Code be amended. He argued that the word "purposely" should be "limited to a murder committed with deliberate and premeditated malice" and that it had "no proper function in connection with homicides committed in the perpetration of another felony." [12] The Congress expanded the text proposed by the Attorney General as applicable to felony-murder situations so that a person who *"without purpose so to do"* kills another in perpetrating or in attempting to perpetrate" a robbery "is guilty of murder in the first degree." (Emphasis added.) [13]

That there might be no doubt of the Congressional intention, the 1940 amendment further specified that except as provided for first degree situations "Whoever with malice aforethought * * * kills another, is guilty of murder in the second degree." [14]

We held flatly in Green v. United States [15] that a second degree verdict could not stand. There the appellant was found guilty of arson, the essential ingredient which caused the unpurposed killing of another to fall within the statutory definition of felony-murder, i. e., murder in the first degree. So, as both arson and an unpurposed killing during its perpetration were proved, the verdict had to be guilty of murder in the first degree or not guilty. The evidence did not justify or permit a second degree instruction.

In Wheeler v. United States,[16] we considered questions arising where the killing occurred while the robbery actually was in progress. Wheeler, in the rear of the store, shot and killed the proprietor in the course of the robbery while Patton out in front at a soda fountain held the clerks at gunpoint. Patton argued he had

---

7. See cases cited in note 6 and Wheeler v. United States, supra note 3. Cf. Green v. United States, 1957, 355 U.S. 184, 190, 78 S.Ct. 221, 2 L.Ed.2d 199.

8. Supra note 1.

9. See, e. g., Kinard v. United States, 1938, 68 App.D.C. 250, 253, 254, 96 F.2d 522, 525, 526.

10. 54 Stat. 347, § 1; and see notes 1 and 2 supra.

11. Jordon v. United States, 1936, 66 App. D.C. 309, 311, 87 F.2d 64, 66, certiorari denied, 1938, 303 U.S. 654, 58 S.Ct. 762, 82 L.Ed. 1114.

12. The Attorney General's letter to the Congress is set out in full in our appendix. And see S.Rep. No. 55 (to accompany S. 186) 76th Cong., 1st Sess. 2 (1939).

13. See note 1 supra.

14. 54 Stat. 348, D.C.Code, § 22–2403 (1951).

15. Supra note 5. The second Green case, 1956, 98 U.S.App.D.C. 413, 236 F.2d 708, reversed 1957, 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199, did not alter that holding.

16. Supra note 3.

not participated in the robbery at the rear of the store and that he could be found guilty only of the robbery he had committed. He received part of the contents of the cash register at the soda fountain. It may be assumed Patton had no knowledge that Wheeler would shoot and that Patton was "without purpose" that the proprietor be killed. Both accused, however, were engaged jointly in the perpetration of a general hold-up of the store in the course of which the homicide occurred. The robbery, clearly, was shown to be an essential element of the enterprise then actively in progress. Both accused were found guilty of murder in the first degree, and this court affirmed.

In Carter v. United States[17] we were confronted with a variant in that the victim of the robbery notified nearby police who in a short time commenced pursuit of the robber. The latter still carrying away the fruits of his crime, perceiving the officer, turned and shot him. We noted that the appellant had recognized the principle "that during continuous pursuit immediately organized and begun, asportation is still going on, with the result that the robber is guilty of first degree murder if in those circumstances he kills a pursuer."

Because of the slight interval before pursuit commenced, we said, "The question is whether, for that reason, the trial judge should have instructed the jury that as a matter of law asportation had ended when the pursuit began and that therefore the robbery was no longer in progress when the appellant shot the pursuing officer; and that as a consequence

Carter could not be found guilty of first degree murder * * *."[18]

We held that the jury was amply justified in finding that the murder was done in the perpetration of the robbery.[19]

In the instant case, supplementing what was said by the proprietor, appellant's own testimony established that his brother pointed a loaded revolver at Mr. Bookoff and that appellant reached into the cash register and took "some money" before both robbers fled. In immediate, close and continuous pursuit, the police officers followed the appellant up to the very instant of the killing. The case, in that posture, even more cogently than in Carter, presents an unbroken chain of fact and circumstance which links the robbery and the homicide so that the killing comes squarely within the statute. On such evidence, without more, the trial court did not err in failing to instruct that the jury might return a second degree murder verdict.[20] Indeed, the judge would have erred had he so charged,[21] a proposition long since and firmly established by the Supreme Court in Sparf v. United States, 1895, 156 U.S. 51, 103, 15 S.Ct. 273, 293, 39 L.Ed. 343, where we read:

"To instruct the jury in a criminal case that the defendant cannot properly be convicted of a crime less than that charged, or to refuse to instruct them in respect to the lesser offenses that might, under some circumstances, be included in the one so charged —there being no evidence whatever upon which any verdict could be properly returned except one of

17. Supra note 4.

18. Id., 96 U.S.App.D.C. at page 42, 223 F.2d at page 334.

19. Certiorari was denied, note 4 supra. And see The Felony Murder Doctrine, 20 Cornell L.Q. 288, 303 (1935).

20. Giving full sway to Fed.R.Crim.P. 31 (c), 18 U.S.C.A., an accused in a particular situation may be found guilty of any offense necessarily included in the

crime charged. "But an instruction on a lesser included offense should not be given unless there is evidence to justify it." Goodall v. United States, supra note 6, 86 U.S.App.D.C. at page 151, 180 F.2d at page 400. We noted such an exception in Kitchen v. United States, 1953, 92 U.S.App.D.C. 382, 205 F.2d 720, (after retrial) Kitchen v. United States, 1955, 95 U.S.App.D.C. 277, 278 note 1, 221 F.2d 832, 833 note 1.

21. Green v. United States, supra note 5.

guilty or one of not guilty of the particular offense charged—is not error * * *." [22]

## IV

■ The principles so clearly established in Wheeler, where the killing occurred during the robbery, and in Carter where the essential ingredients of robbery, asportation, flight and killing formed one continuous chain, are here challenged. Was there such an "arrest" [23] of the appellant as to break the essential link between the robbery and the killing? Our answer is critical for continuity of the several elements must be shown, as in Carter, or section 22–2401 of the Code will not apply. We look to the record closely as it bears on this phase of our problem.

Gaining the street, as we have seen, appellant ran diagonally across toward an alley, entered it and thereafter turned into the second alley. Officer Winters from his own long experience with the neighborhood, expected the man to be around the corner we have described He testified in detail:

"I walked down the alley, and as I came about to this point abreast of this nook, I observed the same man that I had chased out of the liquor store, standing with his back facing up against this wall. * * * He was standing with his back up against this wall here; his back was facing the wall. He had his hands in his pockets. I pointed my revolver at him and said, 'This is the Police. Put your hands up.' "

Questioned by the prosecutor "And what happened after you said that?", Officer Winters replied:

"At that point Officer Brereton, who had been following me, but was still running, came running down the alley. Officer Brereton was running down the east side of the alley. I yelled to Officer Brereton to stop, that I had him. At that same time this man that I had cornered came out and grabbed Officer Brereton and they grappled right here in this nook. * * * I had my gun drawn and was pointing it at the man before Officer Brereton ran down the alley."

The examination proceeded thus:

"Q. And when Officer Brereton ran down the alley between you and the man, what did you do as far as your gun was concerned? A. I had lowered my gun. I put my gun down.

"Q. And then what if anything did you observe happen from that point? A. I started to cross the alley to assist Officer Brereton, who was struggling with the man. I took about two steps, and there was a shot. And Officer Brereton started to fall."

\* \* \* \* \* \*

"The man had turned, and when I raised my gun he pointed the gun at me and I raised my gun at him," [and then] "The man shot me."

\* \* \* \* \* \*

"Q. Now then, after you were shot and hit, as you have described, what happened to you? Did you go down? A. Right after he shot me, I fell down and fired once at him.

"Q. All right. And then did you see or hear anything after that? A. There was a third shot from the man.

"Q. And did you hear that shot? A. I heard that shot, yes.

"Q. Did you see anything with regard to the third shot? A. Yes, I saw the flash.

"Q. The flash; and that came from what area? Where the man

22. Cf. Berra v. United States, 1956, 351 U.S. 131, 134, 76 S.Ct. 685, 100 L.Ed. 1013; Chaifetz v. United States, 1960, 109 U.S.App.D.C. 349, 288 F.2d 133, reversed in part on other grounds 1961, 366 U.S. 209, 81 S.Ct. 1051, 6 L.Ed.2d 233.

23. Appellant's trial counsel moved for acquittal "with special emphasis on Count One" on the ground that "a bona fide arrest" had occurred which "stopped the felony."

562

was? A. I was here; the flash came from here. And as I heard the shot and saw the flash, I rolled; I rolled out of line. I thought the man was following me up the alley, when I rolled. And I came up on my feet, and as I came up on my feet, I saw the man running out the alley, and I fired two more shots at him as he ran out the alley."

It is clear from the record that the entire elapsed time from robbery to shooting was a matter of mere minutes. Officer Winters was unable to testify as to certain details "because everything was happening too fast." Nevertheless he filled in particulars which developed as he pointed his gun at the appellant and said "I am a policeman. Put your hands up." [24]

We paraphrase in part and quote directly as shown.

Coleman took his left hand out of his pocket. "At that time is when Officer Brereton came in between us." The latter had been running down the alley, his gun in hand and "as he came to the point where I had the man at bay, I yelled at him, I hollered. It was a little as a warning. It was to let him know that I had him, so that he wouldn't come in between us and so that he could see that I had him. He couldn't have realized that I had already had the man, because he couldn't possibly see the man, from where he was running. The man was still out of his

sight. * * * As soon as I finished yelling is when he was grabbed. * * * He just grabbed him by the body. * * * I think he grabbed his gun." [25]

Counsel for the respective parties argued to the jury the issue of appellant's "arrest." Both the Government and the defense submitted proposed instructions on the point. Government's instruction No. 6 was read to the jury as follows:

"The jury is instructed that the essential elements of the first count of the indictment, namely, the felonious murder count, are that a robbery was committed and that it had not been concluded before the killing took place. The carrying away of the fruits of the robbery would form an essential part of the robbery. The robbery would also continue, under the circumstances of this case, until the robber had been effectively placed under arrest."

The trial judge explained the instruction in these words:

"The essential element here is whether the police had *actually placed William Coleman under arrest and had received his surrender.* If you find beyond a reasonable doubt that the defendant William Coleman perpetrated a robbery in the Le Droit Liquor Store and was in the process of carrying away the fruits of the crime at the time he was overtaken, and if you also find that he did shoot

24. Conformably to the law of arrest, infra, we have observed that an officer in "making an arrest for a felony, as to the means taken to apprehend the supposed offender, and to keep him safe and secure after such apprehension" has been held to possess substantial discretion. Barrett v. United States, 1933, 62 App. D.C. 25, 26, 64 F.2d 148, 149.

25. Appellant testified: "After he said, 'Put your hands up,' I was bringing my hands up. I heard him. He turned his head and he said something to, you know, and I heard another commotion, you know, come up, something like that. All at once somebody came in towards me

and was talking and saying something and pointing something at me."

He further testified that the person who came up had a revolver and "Well, I got scared, frightened that he was going to shoot, something like that, and I grabbed ahold of his arm and we started tussling."

He added "Well, after I grabbed ahold of the gun, we started tussling; and all at once the gun just went off, kept going off." The police officer fell and "Well, after he fell, I took ahold of the gun and stated running."

The police throughout the episode had no knowledge that this appellant was previously unarmed.

and kill Officer Brereton, *provided that at the time of the shooting neither Officer Winters nor Officer Brereton had effectively and actively placed William Coleman under arrest, and had received his surrender,* if you find these facts beyond a reasonable doubt, you should find the defendant William Coleman guilty of count 1." (Emphasis added.)

We quote further from the charge:

"The next instruction which I shall read is likewise asked by the defendant William C. Coleman. It reads:

"You are instructed that an arrest is the restraint of the right of locomotion, or a restraint of the person. It may be made without force or without touching the body. It is sufficient if the party arrested is *within the power of the officer and submits to arrest,* even as a result of a verbal command. (Emphasis added.)

"This further instruction asked by the defendant William C. Coleman reads as follows:

"You are instructed that in order for there to be an arrest it is not necessary that there be an application of actual force, or manual touching of the body, or physical restraint which may be visible to the eye, or a formal declaration of arrest. *It is sufficient if the person arrested understands that he is in the power of the one arresting, and submits in consequence.* (Emphasis added.)

"One further instruction asked by the defendant William C. Coleman:

"If you believe from the evidence that the defendant William C. Coleman *submitted and was under arrest of Officer Clyde R. Winters, and that this arrest stopped or cut off the robbery and the resulting aspiration, (sic) then you cannot find the defendant William C. Coleman guilty of murder* in the first degree as stated in count 1 of the indictment." (Emphasis added.)

Clearly, the issue was submitted to the jury. Its verdict establishes that the jury rejected the appellant's version of the circumstances in question and credited the testimony of Officer Winters. Unless the instructions as given can be found wanting as a matter of law, the jury's verdict must stand.

In Morton v. United States [26] we considered the question of whether or not there had been such a lawful arrest on a criminal charge as to justify a search and seizure incidental to the arrest. Deciding *for that purpose* [27] that an arrest had been made, we looked to Long v. Ansell [28] from which we now quote:

"Thus it appears that the word 'arrest' has a well-defined meaning. *There must be some detention of the person to constitute arrest.* This of course would mean any arrest made or detention in a criminal proceeding * * *. 'An arrest is the seizing of a person and *detaining him in the custody of the law.'* From these authorities, it may be concluded, we think, that the term arrest may be

**26.** 79 U.S.App.D.C. 329, 331, 147 F.2d 28, 30, certiorari denied 1945, 324 U.S. 875, 65 S.Ct. 1015, 89 L.Ed. 1428; cf. Rios v. United States, 1960, 364 U.S. 253, 261, 262, 80 S.Ct. 1453; Brinegar v. United States, 10 Cir., 1947, 165 F.2d 512, 514 defining arrest in terms of probable cause for a search, affirmed 1949, 338 U.S. 160, 164, 69 S.Ct. 1302, 93 L.Ed. 1879. "Arrest" in such cases is usually intertwined with questions as to probable cause. See, e. g., Bell v. United States, 102 U.S.App. D.C. 383, 254 F.2d 82, certiorari denied

1958, 358 U.S. 885, 79 S.Ct. 126, 3 L. Ed.2d 113.

**27.** See Henry v. United States, 1959, 361 U.S. 98, 103, 80 S.Ct. 168, 171, 4 L.Ed. 2d 134, where because of a restriction of "liberty of movement, the arrest, *for purposes of this case"* was held to be complete. (Emphasis added.)

**28.** 1934, 63 App.D.C. 68, 71, 69 F.2d 386, 389, affirmed, 293 U.S. 76, 55 S.Ct. 21, 79 L.Ed. 208.

applied to any case *where a person is taken into custody or restrained of his full liberty,* or where the detention of a person in custody is continued for even a short period of time. People [ex rel. Taranto] v. Erlanger (D.C.) 132 F. 883." (Emphasis added.) [29]

Quite apart from anything we have said in different context as to what factors constitute an arrest, the trial judge adequately explained the issue. The jury could not have failed to understand that the Government was bound to prove beyond a reasonable doubt that there had been an unbroken continuity between the robbery and the killing. And the jurors could not have so found unless they also rejected the contention that an officer had actually arrested Coleman and had received his surrender. Surely there was no custody, nor was there detention in the almost split second action so evident from the testimony. Additionally, three times, as the defense requested, the jury was told that Coleman must have been within the power of the officer and have submitted to that power.

The jury simply refused so to find. On the contrary, it readily could have concluded that Coleman, overtaken and faced with capture, not only did not submit, but rather had determined to fight his way to escape. After or while wresting the gun from the officer, he shot Officer Brereton twice and thereafter shot Officer Winters once and fled, not to be placed in custody until after he had sur-

rendered to the F. B. I., nearly two days later.

Trial counsel made no objection to the charge as given. Even so we have examined the record and the instructions on this critical issue (and all others present in this case) as we are bound to do especially where a man's life is at stake.[30] We are satisfied that the trial court did not err.

## V

■ Appellant argues that his convictions on both counts were secured through information obtained in violation of the Mallory rule [31] and of the Fifth and Sixth Amendments. We find no merit in this contention. For one thing, no confession by the appellant was introduced against him. Moreover the evidence of many witnesses overwhelmingly established all of the basic elements of the crimes.[32] Then the appellant took the stand and testified freely in support of the plan of defense outlined by counsel in his opening statement. He described the details of the robbery, how the gun had been held on the store proprietor who was commanded to lie on the floor, how he then reached into the cash register, pulled out some money and put it in his pocket, then the warning, the flight with the consequent pursuit, the struggle for the officer's revolver and the shooting. In detail, indicating on the chart, he traced his movements from the store to the corner off the alley, down to where he had hidden the revolver in a car. He sought to establish a basis for

---

29. In Morton v. United States, supra note 26, in note 7 various authorities were cited including Perkins, The Law of Arrest, 25 Iowa L.Rev. 201 (1940). At page 206 the author states: "Mere words will not constitute an arrest, while, on the other hand, no actual, physical touching is essential. The apparent inconsistency in the two parts of this statement is explained by the fact that an assertion of authority and purpose to arrest *followed by the submission of the arrestee* constitutes an arrest." (Emphasis added.) See also [1954] Crim.L. Rev. 6 (Eng.) Requisites of a Valid Arrest; The Law of Arrest, 1 Baylor L.

Rev. 397 (1949); Legal and Social Aspects of Arrest, 49 Harv.L.Rev. 566 (1936); A Modern Law of Arrest and Some Trends in the Law of Arrest, 39 Minn.L.Rev. 473 and 479 (1955).

30. Fisher v. United States, 1946, 328 U.S. 463, 467–468, 66 S.Ct. 1318, 90 L.Ed. 1382; Kinard v. United States, supra note 9.

31. Mallory v. United States, 1957, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479.

32. Cf. Watts v. United States, 1960, 107 U.S.App.D.C. 367, 371, 372, 278 F.2d 247, 251, 252.

the jury to conclude either that an arrest had so broken the chain that the killing was a new crime, or that the killing had occurred in self defense.[33]

After the appellant surrendered to the F. B. I. on the morning of January 9, 1960, he was turned over to the Metropolitan Police and was questioned. At first, he denied guilt. Later he admitted participation in the robbery, but otherwise denied guilt and implicated his brother, the co-defendant. About 2 P.M. that day, Ray S. Coleman, who had been held as a material witness, was brought from a hotel and was informed appellant had admitted his part in the robbery. Confronted by the appellant, Ray then said, "You are not going to lay the shooting off on me," and again, "I am not going to take the blame for what you did." Omitting other details, we note that Ray finally reenacted the robbery at the liquor store, and to prove his claim of exculpation, he led the officers to where he had concealed the gun which he had carried during the robbery. Thereafter, about 3:30 P.M., appellant and his brother were presented in the Municipal Court, counsel were appointed, and both accused were advised of their rights.

█ Certainly there was no impropriety here in the police arrangements for confrontation of the two accused.[34] That each in one respect or other charged his brother with varying aspects of the crimes does not militate against cross-examination by the prosecution as to phases of their revelations. Such situations are common when two or more criminals proceed jointly in some nefarious venture.[35] The contentions urged upon us come to no more than this; ap-

pellant would have us order a new trial although he stated under oath that he committed the crime of robbery [36] which culminated in the death of Officer Brereton at the appellant's hands. Any such outcome would be a trifling with the administration of the criminal law,[37] and we perceive no error affecting substantial rights.[38]

## VI

We need not discuss, although we have explored and fully considered appellant's other contentions. We find no error. We are convinced appellant's trial was fair and thorough, and his convictions must be

Affirmed.

## Appendix

DECEMBER 30, 1938.

HON. HENRY F. ASHURST,

*Chairman, Committee on the Judiciary, United States Senate, Washington, D. C.*

MY DEAR SENATOR: Experience in the administration of the statute of the District of Columbia relating to murder, leads to the conclusion that the existing law requires some clarification.

Section 798 of the Code of Law for the District of Columbia (act of Mar. 3, 1901, 31 Stat. 1189) defines murder in the first degree. It includes within such definition a killing perpetrated purposely and either of deliberate and premeditated malice or by means of poison, and in addition, a killing committed in perpetrating or in attempting to perpetrate any offense punishable by imprisonment in a penitentiary. In providing that a homicide committed in the perpetration

33. Cf. Turpin v. United States, 108 U.S. App.D.C. 274, 281 F.2d 637, certiorari denied 1960, 364 U.S. 919, 81 S.Ct. 284, 5 L.Ed.2d 261.

34. Cf. Hawkins v. United States, 1946, 81 U.S.App.D.C. 376, 158 F.2d 652, certiorari denied 1947, 331 U.S. 830, 67 S.Ct. 1347, 91 L.Ed. 1844.

35. See, e. g., Wheeler v. United States, supra note 3; Williams v. United States, 6 Cir., 1959, 272 F.2d 822, 823, certio-

rari denied 1960, 364 U.S. 836, 81 S.Ct. 72, 5 L.Ed.2d 61.

36. The court is unanimous that Coleman was properly convicted of robbery.

37. Wheeler v. United States, supra note 3, 82 U.S.App.D.C. at page 368, 165 F.2d at page 230.

38. Starr v. United States, 1958, 105 U.S. App.D.C. 91, 95, 96, 264 F.2d 377, 381, 382, certiorari denied 1959, 359 U.S. 936, 79 S.Ct. 652, 3 L.Ed.2d 639.

of another felony constitutes murder in the first degree, the law of the District of Columbia is in accord with the law of most States, as well as in accord with the common law.

Section 798 of the District of Columbia Code reads as follows:

"Whoever, being of sound memory and discretion, purposely, and either of deliberate and premeditated malice or by means of poison, or in perpetrating or in attempting to perpetrate any offense punishable by imprisonment in the penitentiary, kills another, is guilty of murder in the first degree."

It will be observed that the code employs the term "purposely" in defining murder in the first degree and that the word "purposely" is so placed in the statute as to apply not only to a homicide consummated with deliberate and premeditated malice, but also to a homicide committed in perpetrating another felony.

Some difficulty and confusion has been caused by the application of the word "purposely" to murders committed in perpetrating another felony (Marcus v. United States, [66 App.D.C. 298], 86 F. 2d 854; Jordan v. United States, [66 App.D.C. 309], 87 F.2d 64). It would seem that this word has no proper function in connection with homicides committed in the perpetration of another felony and should be limited to a murder committed wih deliberate and premeditated malice.

An examination of the statutes of the several States indicates that only Ohio employs the word "purposely" in the manner in which it is used in the District of Columbia Code (Ohio Penal Code, title I, c. (3), sec. 12400). In most of the other States the killing of a human being when perpetrated in the commission of another felony, constitutes murder in the first degree and purpose is not an element of the crime under such circumstances.

I, therefore, suggest that the statute should be clarified so as to render the word "purposely" solely a limitation on deliberate and premeditated homicides, instead of being applicable as well to the other type of murder heretofore referred to. In order to accomplish this result, I suggest that the statute be amended to read as follows:

"Whoever, being of sound memory and discretion, kills another purposely and either of deliberate and premeditated malice or by means of poison, or kills another in perpetrating or in attempting to perpetrate any offense punishable by imprisonment in the penitentiary, is guilty of murder in the first degree."

A bill to carry into effect the foregoing recommendation has been drafted in this Department and is enclosed herewith. I recommend its enactment.

A similar bill was passed by the Senate in the last Congress.

Sincerely yours,
HOMER CUMMINGS,
*Attorney General.*

[CHART OF AREA]

FAHY, Circuit Judge, with whom EDGERTON, BAZELON and WASHINGTON, Circuit Judges, join *(concurring in part and dissenting in part)*.

I concur in affirming the conviction of robbery. As to the conviction of first degree murder, carrying the death penalty, I dissent, being of the opinion that defendant is entitled to a new trial of the murder charge.

Appellant committed the homicide. This is not in dispute. The question for the jury, submitted under the court's instructions, was whether the homicide was committed during the perpetration of a robbery. The homicide charge is what is commonly known as "felony murder," a category of first degree murder, 22 D.C. Code, § 2401 (1951), which is killing another in the perpetration of certain enumerated felonies, robbery in this case. The indictment as found by the grand jury, however, contained a second count, charging first degree murder based on "deliberate and premeditated malice," elements which need not be proved for first degree "felony murder." This second count was withdrawn by the Government at the beginning of the court proceedings. Defense counsel at first assented to the withdrawal but later the same day and before the jury was impanelled and sworn, and after consultation with defendant, unsuccessfully requested the court to reinstate the count. The request was made for the very purpose of insuring the right of the jury to consider second degree as well as first degree murder. The refusal of the court to reinstate would present for me a serious question if the absence of the second count dispensed with the necessity for an instruction on second degree murder. I conclude, however, that in the circumstances of the case defendant was entitled to such an instruction under the felony murder count which went to trial.

No instruction on second degree murder was given to the jury. For this reason the jury had no alternative but to find that the homicide was committed during the robbery, and therefore was first degree murder, or else to acquit the defendant of homicide. Yet as clearly appears from the majority opinion, there was evidence from which the jury could find that the robbery had been terminated by the arrest of defendant before he gained possession of Officer Brereton's gun and killed him. If an arrest had been made before the shooting—a question of fact which was explicitly submitted to the jury—the felony murder count could not be sustained. Since in that event the evidence would support a conviction of second degree murder it was essential that the jury be instructed as to that offense.[1] This follows from an elementary rule of general application. Where the evidence supports either of two offenses, one less serious than the other and an "included" offense, the court instructs in a manner to permit the jury to convict of either depending upon how they resolve the conflicting evidence. This is simply a matter of giving the jury the law applicable to the facts of the case as they may be found by the jury. Goodall v. United States, 86 U.S.App.D.C. 148, 151, 180 F.2d 397, 400, certiorari denied 339 U.S. 987, 70 S.Ct. 1009, 94 L. Ed. 1389.

That this general rule applies in this jurisdiction notwithstanding the indictment is for felony murder is clear. As stated by the Supreme Court in Green v. United States:

"The suggestion is made that second degree murder is not an offense included in a charge of felony murder under the District Code because it involves elements different from those necessary to establish a felony murder and therefore that Green could not legally have been convicted of second degree murder under the indictment. We fail to comprehend how this suggestion aids the Gov-

---

[1] Since the majority affirm I discuss the matter of second degree only, omitting consideration of manslaughter or the claim of excusable homicide. For purposes of clarity and simplicity, I treat the case as involving only the necessity of an instruction on second degree murder.

ernment. In the first place, the District of Columbia Court of Appeals has expressly held that second degree murder is a lesser offense which can be proved under a charge of felony murder. Goodall v. United States, 86 U.S.App.D.C. 148, 180 F.2d 397; Green v. United States, 95 U.S.App. D.C. 45, 218 F.2d 856."

355 U.S. 184, 194 note 14, 78 S.Ct. 221, 227, 2 L.Ed.2d 199.

The evidence to justify an instruction on the "lesser offense" need be only slight. Stevenson v. United States, 162 U.S. 313, 16 S.Ct. 839, 40 L.Ed. 980. It amply meets the test in this case. Indeed, the case went to the jury on the theory of a factual issue whether the robbery had been terminated by the arrest of defendant before he shot the deceased. The issue of arrest could be decided either way on the evidence and the court so instructed the jury. When this is considered with the fact that there can be no doubt there was evidence from which the jury could find the shooting was with malice aforethought, see 22 D.C.Code, § 2403 (1951), a second degree instruction was required. Goodall v. United States, supra. And see Kinard v. United States, 68 App.D.C. 250, 96 F.2d 522; McDonald v. United States, 109 U.S.App.D.C. 98, 284 F.2d 232. The jury could not validly be boxed in with the alternative of out-and-out acquittal or a conviction only of first degree felony murder. The factual issue as to the arrest required the jury to be instructed as to the law applicable to either resolution of that issue. They could not be limited to a verdict of guilty of felony murder if they found the arrest had not been effected and of not guilty if they found it had been effected. For if they found the latter there was evidence upon which they could rest a second degree verdict. They were not so instruct-

ed; yet this was a vital part of the law of the case. As the majority points out the court instructed the jury they could find an arrest before the homicide—that is, they could find the homicide was not in the perpetration of a felony—yet the court left the jury in that event with the alternative only of acquittal when there was also on the evidence the alternative of a verdict of second degree murder.

The fact that the jury found defendant guilty of felony murder of course does not foreclose the issue of second degree; for the verdict can be deemed even factually valid only if rendered under proper instructions as to the law. The verdict, in other words, does not prove itself unless rendered under instructions which give the jury before they resolve the factual issues the latitude of verdicts the law permits, dependent upon how they shall resolve those issues. This is a commonplace in the review of both civil and criminal cases.

Failure of counsel to request the instruction at the time the court was charging the jury does not relieve the courts of responsibility in the matter. Not only is this a capital case, but, as we have said, the trial court, before the jury was impanelled and sworn, had refused the request of defense counsel to reinstate count two although counsel stated to the court he desired the count reinstated so that the jury would have the basis for a conviction of a lesser offense.[2] It seems clear that when reinstatement was denied counsel was of opinion the defendant would not be entitled to the instruction under the felony murder count which remained. Especially in these circumstances the absence of further request does not preclude our consideration of the merits of the problem. The matter is vitally related to the law of the case, wherein the chief responsibility in any event lies with

2. Counsel stated at the time of the request as follows:
"The reason we would like to reinstate it is that the jury would have the choice of a finding of guilty of felony murder, which would mean the electric chair, or just robbery. With first degree murder the jury would have the opportunity to find for a lesser homicide charge, second degree, and so forth. We would like the jury to have that choice."

the court. The error is strongly pressed in this court. Even were it not we should pass upon it:

> "Although no objection as to the form of these instructions is urged here by counsel for petitioner, this Court in a criminal case may notice material error within its power to correct even though that error is not specifically challenged and certainly should do so, even in cases from the District of Columbia, where life is at stake. Brasfield v. United States, 272 U.S. 448, 47 S.Ct. 135, 71 L.Ed. 345; compare [18 U.S.C.A.] Rules 54(a) (1), 59, 52(b), Rules of Criminal Procedure."

Fisher v. United States, 328 U.S. 463, 467–468, 66 S.Ct. 1318, 1320, 90 L.Ed. 1382. And see Stewart v. United States, 94 U.S.App.D.C. 293, 296, note 7; 214 F. 2d 879, 882 note 7; Collazo v. United States, 90 U.S.App.D.C. 241, 253, 196 F. 2d 573, 585, certiorari denied 343 U.S. 968, 72 S.Ct. 1065, 96 L.Ed. 1364; Kinard v. United States, 68 App.D.C. 250, 254, 96 F.2d 522, 526; McDonald v. United States, supra.

My reference to the failure of counsel to call the matter again to the trial court's attention is not in criticism; it is rather in recognition of the difficulties confronting trial counsel in the case. In unsuccessfully seeking reinstatement of count two he did in fact take steps to bring the issue of second degree into the trial.

It may be the result would have been the same had the instruction been given. One cannot say. One can say, however, that this is for a jury to decide under adequate instructions on the law applicable to the facts as the jury might find them. Only by such a decision can final judicial disposition be made, in my opinion, of this most deplorable homicide.

I would affirm the conviction of robbery and grant a new trial of the murder charge.